Ruby KOLOD, Appellant,

v.

UNITED STATES of America, Appellee.

Willie Israel ALDERMAN, Appellant,

v.

UNITED STATES of America, Appellee.

Felix Antonio ALDERISIO, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 8268–8270.

United States Court of Appeals
Tenth Circuit.

Feb. 3, 1967.

Rehearing Denied March 8, 1967.

Edward Bennett Williams, Washington, D.C. (Harold Ungar, Washington, D.C., for appellant Ruby Kolod, William P. Johnson and Donald L. Giacomini, Denver, Colo., for appellant Willie Israel Alderman, W. H. Erickson, Denver, Colo., for appellant Felix Antonio Alderisio, were with him on the brief), for appellants.

James A. Clark, Denver, Colo., and William S. Lynch, Washington, D. C. (Lawrence M. Henry, U. S. Atty., Denver, Colo., Brian P. Gettings and Phillip R. Michael, Washington, D. C., were with them on the brief), for appellee.

Before MURRAH, Chief Judge, and LEWIS and BREITENSTEIN, Circuit Judges.

DAVID T. LEWIS, Circuit Judge.

Appellants were convicted by a jury in the United States District Court for the District of Colorado under the first count of an indictment charging a conspiracy to transmit in interstate commerce communications containing threats to injure and murder one Robert Sunshine in violation of 18 U.S.C. § 371 and 18 U.S.C. § 875(c). Another co-defendant, Americo Di Pietto, was acquitted of that charge. Appellants Kolod and Alderisio and co-defendant Di Pietto were indicted in a second count for transmission in interstate commerce of communications containing threats to injure Sunshine with intent to extort from him approximately $65,000 in violation of 18 U.S.C. § 875(b). The jury acquitted all three of this charge. The court sentenced appellant Kolod to imprisonment for a term of four years and a fine of $7,500; appellant Alderman to imprisonment for a term of three years and a fine of $5,000; and appellant Alderisio to imprisonment for a term of four and one-half years and a fine of $7,500.

The alleged conspiracy related to a certain oil transaction. According to the evidence of the prosecution, in June 1959 Robert Sunshine and others persuaded appellant Kolod to join them in an oil-lease investment in Nebraska. Kolod paid $78,150 in cash for a joint interest that was then owned by William H. Young, a consulting geologist and business associate of Sunshine. Ten thousand dollars of Kolod's purchase money was paid directly to Young while the balance of $68,150 was turned over to Sunshine to be held in escrow pending transfer of warranted title and confirmation of current production. Kolod's interest was later divided equally between himself and appellant Alderman.

Kolod and Alderman did not receive any oil payments out of their investment until July 1960. In the meantime, Sunshine had invaded the escrow money to pay off encumbrances on the oil properties, and by October 1960 the escrow money was completely exhausted. During that month Kolod and Alderman visited Sunshine at his office in Denver to express their displeasure with the transaction. Sunshine was told that since he had given personal approval of the deal, he would be looked to for return of the full purchase price, either in a lump sum or in oil payments. Thereafter, in December 1960 and January 1961, Sunshine sent Kolod and Alderman the only additional oil run checks that were to come from actual production.

Throughout the spring of 1961 there were numerous long-distance telephone conversations between Kolod and Alderman in Las Vegas, Nevada and Sunshine in Denver relating to the cessation of oil payments and Kolod's and Alderman's demand for return of their invested money. According to Sunshine's testimony at the trial, these conversations included numerous threats by Kolod and Alderman to the effect that unless the money was returned promptly, Sunshine would receive a visit from "a lawyer" or "a Chicago lawyer" who would not be coming for the purpose of suing. Sunshine understood these remarks to mean that he would be killed if the money was not returned in full. The threatening nature of at least one of these long-distance conversations was verified by William Young who, at Sunshine's request, listened in on an extension telephone.

In a telephone conversation between Las Vegas and Denver on June 22, 1961, Kolod instructed Sunshine to give the money to Kolod's nephew who would be attending a dentists' convention in nearby Boulder, Colorado. On June 28, Sunshine and Young met the nephew at the Denver Airport and reported that the money was not yet available. The nephew suggested that in view of Kolod's anger over the situation, Sunshine had better straighten out the matter immediately; whereupon Sunshine placed a call to Kolod from a pay station at the airport. The conversation was brief with Kolod

responding that he would talk to Sunshine later. That evening Kolod called Sunshine to tell him that the matter had been discussed with Alderman and they had decided "to send a lawyer to take care of" him.

On July 6, 1961, appellant Felix Alderisio and Americo Di Pietto visited Sunshine at his office in Denver. Both men were from Chicago and unknown to Sunshine. Both had registered at Denver's Brown Palace Hotel where Alderisio used a fictitious name and address. Alderisio had known Kolod and Alderman for approximately ten years, and several weeks before the visit to Denver he had been a guest at the Desert Inn in Las Vegas where Kolod was an officer and stockholder. At that time, a check for $16,600 was issued to Alderisio by the Desert Inn after Kolod presented the hotel teller with cash in the same amount.

According to Sunshine, Alderisio introduced himself, sat down, and stated: "Ruby sent us. We came here to kill you." Di Pietto said nothing except to introduce himself as "Pete." Sunshine attempted to reason with the two men by demonstrating the legitimacy and his own good faith in the oil-lease transactions. After over an hour of discussion, Alderisio told Sunshine that only Kolod could save him. At Sunshine's suggestion, Alderisio placed a long-distance call from Sunshine's office to the Concord Hotel near Monticello, New York where Kolod and Alderman were then staying. When Sunshine was put on the telephone, Kolod told him that "he and Alderman had sent Alderisio to let [Sunshine] know that there was no fooling around; that they meant business." Kolod then agreed to meet with Sunshine in Las Vegas to work out a final solution for repayment of the money. At the conclusion of the telephone conversation, Alderisio warned Sunshine of severe consequences if he failed to work out a settlement satisfactory to Kolod. Then, he and Di Pietto departed.

In August 1961, Sunshine and Young went to Las Vegas where Sunshine agreed to repay Kolod and Alderman the full $78,150 plus one-third "profit," less amounts already paid. Payments were to be made in monthly installments of approximately $2,000, and in the event actual oil runs were insufficient Sunshine himself was to make up the difference. Thereafter, some payments were made by Sunshine based upon fictitious oil run statements, but some of the checks were returned by the bank to Kolod and Alderman for insufficient funds.

In February 1962, in an interstate telephone conversation relating to the returned checks, Kolod told Sunshine that he might have to send Alderisio again. Then in the early summer of 1962, Kolod told Sunshine by telephone that he was leaving Las Vegas for a trip to Europe, that he would be seeing Alderisio enroute, and that he wanted to be able to tell Alderisio that all of the money had been returned. Sunshine, however, simply continued to send monthly installment checks. Later in the summer, Sunshine had a telephone conversation with Alderman who expressed the hope that the money be paid in full before Kolod's return to the United States so that Sunshine could avoid another visit from Alderisio. Shortly thereafter, Sunshine received a call from Kolod in New York who assured him that they still wanted back all of their investment plus the one-third profit. Sunshine advised Kolod that he was working on a sale of the oil interests so that the balance of their money could be paid in full. In the fall of 1962, Kolod called Sunshine again and gave him until the first of the year to pay up.

In December 1962, Sunshine went to Las Vegas and attempted to borrow money from Kolod. Later in the month, Sunshine was indicted for embezzlement of funds from a Dr. W. S. McClymonds of Denver, and all of his contacts with appellants Kolod, Alderman and Alderisio were terminated.

The trial was essentially a contest of credibility between Sunshine and his associates on the one hand and Kolod, Alderman, and Kolod's nephew on the other as to whether Sunshine was in fact

threatened in interstate telephone conversations. Alderisio and Di Pietto did not testify. This consolidated appeal from the convictions of Kolod, Alderman, and Alderisio points to four rulings in the trial court which, appellants contend, constitute grounds for reversal. These are:

(1) the denial of an opportunity to present before the jury evidence that agents of the Federal Bureau of Investigation had placed a listening device in the executive conference room of the Desert Inn and had never heard Kolod threaten anyone over the telephones in that room;

(2) the denial of a motion by appellants Kolod and Alderman for severance of their trial from that of appellant Alderisio;

(3) the denial of appellants' request for an instruction to the jury that an actual agreement to transmit threats by interstate telephone is an essenial element of the offense charged in the first count of the indictment; and

(4) the denial of appellant Alderisio's motions for judgment of acquittal.

For the reasons hereinafter stated, we find no error in these rulings or in any other aspect of the proceedings below. Accordingly, the judgments of conviction are affirmed.

## I. THE PROFFERED EVIDENCE RELATING TO WHAT THE F. B. I. OVERHEARD.

Throughout the last nine months of the alleged conspiracy, from March 22 to the end of December 1962, agents of the Federal Bureau of Investigation monitored conversations originating in the conference room in the Desert Inn's executive office suite. This was effected through an arrangement between the F.B.I. and the Central Telephone Company of Las Vegas whereby a listening device located in the conference room was connected to telephone company service lines which in turn were connected to the F.B.I.'s Las Vegas office. The device was not a "wiretap," but simply a type of microphone that could pick up normal conversations. In the case of telephone conversations, only the voice of the person speaking from the Desert Inn could be heard.[1] The purpose of the device was to investigate certain suspect activities and associations by the Desert Inn ownership. The investigation was in no way related to the instant case, and in fact counsel for appellant Kolod was advised by Department of Justice officials prior to trial and long after the device was discovered and disconnected that no leads germane to this case were obtained from that source.

At the trial, appellant Kolod testified that many of his interstate telephone conversations with Sunshine, including those in the period March 1962 to December 1962, had been from the conference room of the Desert Inn's executive office suite. Then, for the stated purpose of directly corroborating Kolod's testimony that he had not threatened Sunshine, Kolod's counsel made a proffer that if he would be permitted to explore before the jury the fact that a listening device had been located in that room, he would show that agents of the F.B.I. had overheard many of the telephone conversations between Kolod and Sunshine and had never heard a single threat. After extended consultations out of the jury's presence, the trial judge rejected the proffer as a "fishing expedition," calculated to confuse and prejudice the jury with irrelevant and immaterial evidence against an agency of the government.

---

1. The procedure employed by the F.B.I. in monitoring the device was substantially as follows: Clerks in the office of the Bureau in Las Vegas would listen to loud speakers and record on log sheets any activity during the monitoring period. Whenever voices were heard, an entry would be made on the log sheet and a tape recorder immediately turned on. The tapes would then be given to the agent in charge of the Desert Inn investigation who within two days would review the recorded conversations and either make a summary of their contents or, if found appropriate, make a written transcription. Thereafter, the tapes would be erased and used again, and the log sheets and written reports would be filed in bound volumes.

The court also denied a defense motion for production of the F.B.I. records relating to the Desert Inn investigation, but agreed to inspect in camera the F.B.I. records available to government counsel to determine whether they contained any material which would support the credibility of the defendants' testimony. Upon conclusion of that inspection, the court found that there was absolutely nothing in the materials relating to any conversations between Kolod and Sunshine.

Appellants asserted below and have twice re-asserted in support of their appeal to this court that because of the tenuous thread of credibility upon which the government's case depends, the negative evidence of what the F.B.I. did or did not overhear should have been sent to the jury.

On January 27, 1966, prior to the initial appellate arguments in this case, counsel for the government advised this court that he had learned for the first time of the existence of additional files related to the F.B.I.'s Desert Inn investigation. While it was stated that the files contained no information affecting the pending appeal, counsel requested "an Order that the District Court examine these additional files and the files previously furnished and make such findings and enter such order as justice requires." On May 12, 1966, after the initial appellate arguments, this court ordered a limited remand with directions to the trial court to (a) examine in camera the additional files of the government and (b) allow appellants to call as witnesses such government agents and employees as were included within the proffer of proof and examine the same under the rules of evidence as to their subjective knowledge of the telephone calls. The trial court was further directed that if after such examination and hearing the appellants had established the relevancy of their proffered evidence, an order should be entered for such relief as might be proper under the circumstances.

In granting the limited remand this court stated in its order:

"The original government files * * * were submitted to the trial court for in camera inspection in conjunction with a proffer of proof made by appellants during the course of the trial and purportedly constituted a partial record of mechanically intercepted phone calls made between Las Vegas, Nevada and Denver, Colorado. Appellants as part of their proffer of proof also sought to call as witnesses certain agents and employees of the government who might have knowledge of the substance of such intercepted phone calls that did not reflect in the government files. The proffer of proof was rejected by order of the trial court and such ruling is now asserted to be trial error of a prejudicial nature.

"Usually it is incumbent upon a party who makes a proffer of proof to show the relevancy of such proof as a premise to the proffer. Appellants made no such showing in the case at bar but were unable to do so because knowledge of the contents of the government files and knowledge of what additional subjective information the government agents had or did not have was peculiarly that of the government and not known to appellants. Under these special circumstances, failure of appellants to show the relevancy of the agents' testimony was not fatal to the proffer."

In substance we then concluded that appellants had a right to pursue the possibility that the F.B.I. agents had subjective knowledge of the substance of phone calls made and overheard from the Desert Inn which would substantiate their claim that they had not threatened Sunshine. If, in fact, the agents had listened to Kolod-Sunshine calls and recalled no threats, the testimony would clearly be probative and proper for jury consideration.

Pursuant to our remand, the trial court examined over seven hundred numbered pages of F.B.I. logs which covered

each day, from March 22, 1962 to August 14, 1963, when the listening device was operative in the executive office suite of the Desert Inn. The trial court also heard the testimony of ten persons called as witnesses by defense counsel.[2] All of these persons had been associated with the F.B.I.'s Las Vegas office and its investigation of the owners of the Desert Inn during the period in question.

The logs and a complete transcript of the hearings have now been included in the appellate record. Their contents may be summarized as follows: In none of the materials does it appear that a single telephone call was ever made or received by appellant Kolod in the executive office suite of the Desert Inn. Further, although the materials show that Kolod's name was mentioned several times by other persons, on only two or three occasions between March 22, 1962 and August 14, 1963 does it appear that Kolod was even present in the room where the listening device was located; and on none of those occasions was he talking on the telephone. With respect to the F.B.I. agents called as witnesses by defense counsel at the hearing, not one of them testified to a subjective knowledge of any telephone calls made or received by Kolod. Accordingly, the potential relevancy of the agents' testimony was not established and, to the contrary, it became apparent that Kolod's credibility would be negatived by such testimony. Kolod testified that he used a certain phone; the agents' testimony established only that they overheard no such telephone conversations. Such a nebulous conflict had no probative value in the trial issues and obviously would lead to a dramatic but immaterial diversion to a side issue if submitted to the jury. Appellants failed to establish the relevancy of their proffer, and their request to have this evidence submitted to a jury was properly denied. See Lujan v. United States, 10 Cir., 209 F.2d 190, 194.

Appellants now contend that under the authority of at least two Supreme Court cases and the Fourth Amendment to the United States Constitution, they should have been permitted to inspect the F.B.I. logs that were examined in camera by the trial court and use them in "cross-examination" of the F.B.I. agents. We can find no merit to this contention.

First, because some of the witnesses at the hearing testified that they had consulted the logs to refresh their memories shortly before coming into court, appellants state that those logs should have been turned over to the defense on proper motion under the rule of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and 18 U.S.C. § 3500. We need only cite the distinction made by the trial court: The *Jencks* rule was directed to written evidence referred to by prosecution witnesses; here the witnesses were called to testify in behalf of the defense. Further, *Jencks* was designed to prevent a holding back of evidence relating to the prosecution's case; here, as already demonstrated, the evidence was unrelated to the prosecution.

Next, appellants refer to Dennis v. United States, 384 U.S. 855, 868–875, 86 S.Ct. 1840, 16 L.Ed.2d 973, where it was held that the defense is entitled to inspect grand jury minutes before completion of the cross-examination of prosecution witnesses. We re-emphasize that the F.B.I. agents called to testify in the instant case were defense, not prosecution, witnesses. Thus, the questioning of these agents by defense counsel was direct, not cross, examination. Further, it is manifest that one cannot draw a reasonable comparison between the irrelevant proffer made here and the facts in *Dennis*. We note incidentally that all grand jury minutes requested at the trial of this case, a trial that occurred over a year before the *Dennis* decision, were in fact furnished to defense counsel for use

---

2. Approximately ten additional witnesses were made available by the government but were not called because of a stipulation that their testimony would be much the same as those who were called.

in cross-examination of the government's witnesses.

Finally, appellants suggest that the F.B.I. logs are tangible fruits of an unlawful invasion of privacy and, accordingly, must be returned to the persons whose voices are represented in the summaries and transcriptions. While the legality of such a method of investigation by a law enforcement agency is not presently before us, if we assume without deciding that appellants are correct in their novel contention, they nevertheless are not entitled to this evidence because, on the basis of in camera inspection by both the trial court and this court, there is nothing summarized or transcribed therein which purports to reflect any statement by any appellant. There is, in conclusion, simply no support in law or fact for the proposition that these appellants should have access to these government documents.

## II. THE MOTION TO SEVER THE TRIAL OF ALDERISIO FROM THE TRIAL OF KOLOD AND ALDERMAN.

■ During the trial, after the government had presented its case in chief and after co-defendants Kolod and Alderman had testified in their own behalf, Alderman's counsel moved orally in a chambers conference for severance of the trial of co-defendant Alderisio. As stated to the trial court, the grounds for the motion were (1) that as a co-defendant Alderisio had chosen to exercise his right not to testify but he was needed as a defense witness to exculpate Kolod and Alderman from any association with his and Di Pietto's July 6, 1961 visit to Sunshine's office in Denver, and (2) that under the authority of De Luna v. United States, 5 Cir., 308 F.2d 140, 1 A.L.R.3d 969, rehearing denied, 324 F.2d 375, if Alderisio were called to testify and he declined, counsel for Kolod and Alderman wanted to be able to comment to the jury about it without causing a mistrial. A third ground that apparently is raised for the first time on appeal is that Alderisio's refusal to take the witness

stand was made known to counsel for the other co-defendants only after the government's case was complete. Our consideration of these contentions must reflect the premise that disposition of a motion for severance is a matter within the discretion of the trial court, and will not be set aside upon appeal unless it clearly appears that appellants did not receive a fair trial as a result of the denial of their motion. Baker v. United States, 10 Cir., 329 F.2d 786, 787.

■■ In conjunction with the first ground for the motion, appellant Alderisio filed with the trial court an affidavit stating that appellants Kolod and Alderman had nothing to do with his visit to Sunshine's office, that he was prepared to testify to the matter, but that after giving such testimony he would be compelled to invoke the protection of the Fifth Amendment and thus greatly impair his own right to trial by a fair and impartial jury. The affidavit concluded:

"[Y]our affiant will refuse to testify on behalf of Kolod and Alderman in any trial in which he is also a defendant on the grounds that such testimony would deprive your affiant of the fair trial guaranteed him by the Constitution of the United States."

Significantly, the affidavit was couched in terms which indicated that Alderisio intended to invoke his constitutional privilege against self-incrimination whether he testified as a co-defendant or as a severed defense witness. Had the government attempted to present culpatory evidence from a witness who would refuse defense cross examination upon other than a collateral matter, it would have been appropriate to order the direct testimony stricken. United States v. Cardillo, 2 Cir., 316 F.2d 606, 613–614; Montgomery v. United States, 5 Cir., 203 F.2d 887, 890–891. The case at bar presents the counter problem used as a sudden instrument to present the trial court with apparently impossible alternatives. In such case the law recognizes that timeliness of presentation, totally lacking here, is a proper and prime factor in determining an accused's rights in the

orderly conduct of a trial. Further, even if we ignore the clear import of the affidavit, the trial court could not be forced into the position of having to speculate on whether Alderisio would be more willing to waive his constitutional privilege if and when called as a severed defense witness than he was if and when called as a co-defendant. Gorin v. United States, 1 Cir., 313 F.2d 641, 645–646. The facts here therefore are plainly distinguishable from United States v. Echeles, 7 Cir., 352 F.2d 892, where the pretrial motion for a severance declared that if the co-defendant to be used as an exculpatory witness were tried first, he would not invoke the Fifth Amendment when subsequently called to testify in a separate trial.

Appellants' second ground in support of their motion for severance is similarly unconvincing. Much reliance is placed upon the De Luna case, supra, where the Fifth Circuit stated:

> "If an attorney's duty to his client should require him to draw the jury's attention to the possible inference of guilt from a co-defendant's silence, the trial judge's duty is to order that the defendants be tried separately.
>
> \* \* \* \* \* \*
>
> "[A defendant's] right to confrontation allows him to invoke every inference from [a co-defendant's] absence from the stand." 308 F.2d at 141, 143.

The court went on to recognize the conflicting basic right of an accused to be free from prejudicial comments about his failure to testify, and concluded that severance of the co-defendants was the only fair solution. The important factual distinction between De Luna and the instant case, however, is that in the former, one co-defendant successfully shifted all of the blame to the other co-defendant, whereas here, all co-defendants put forth a single, unified defense based on the theory that the prosecution witnesses had fabricated a preposterous story against them. Kolod and Alderman never alluded to any possible individual guilt on the part of Alderisio, and therefore no benefit could possibly

have been derived from commenting to the jury about Alderisio's failure to testify. Hayes v. United States, 8 Cir., 329 F.2d 209, 221–222. Additionally, in De Luna the motion for severance was made prior to trial and the relationship between co-defendants, as well as between their respective counsel, was at all times a very antagonistic one. Neither of these circumstances appears in the case at bar. The facts of De Luna do not compel a rule of constitutional dilemma expanding, as appellants would have us hold, to the generality that the right of a testifying defendant to comment on the failure of a co-defendant to testify is absolute, as is the non-testifying defendant's right to be free of such comment. Such a rule, as Judge Bell specially concurring in De Luna states, "would eliminate joint trials, or vest in a defendant the right to a mistrial during final arguments, or in the alternative create built-in reversible error, all in the discretion of the defendants." 308 F.2d at 156.

In denying the motion for severance, the trial court concluded:

> "I do not think it proper at this time to make a severance because from the discussion we have had this afternoon on this matter it is clear to the Court that counsel have known about this situation at least for some time prior to the commencement of the trial of this case and it could have then very well been brought to the Court's attention, rather than do it in the middle of a trial and then make some assertions as to the overall desirability of a fair trial for all the parties and so forth."

The "discussion" that the court was referring to included at least two direct invitations to defense counsel, one by the court and one by a government attorney, to state categorically whether they had learned for the first time of Alderisio's election not to testify only after the government's case was complete. Neither invitation was accepted, at least not by direct reply. Then when the court formally denied the motion for severance on the principal ground of timeliness,

**992**

defense counsel failed to object. Now, as appellants, they assert that Alderisio's refusal to testify was in fact brought to the attention of Kolod's and Alderman's counsel for the first time "immediately before they made their motion," and that this confronted them with an unexpected "gap" in their defense strategy. Inasmuch as it has already been shown that the motion for severance was wanting in substantive merit, we have little sympathy for what appellants now assert as a procedural problem. Whatever the procedural difficulties that may have militated against them as a result of Alderisio's refusal to testify, we are inclined to believe that those difficulties are of appellants', not the trial court's, own doing. We therefore find no abuse of the trial court's discretion in denying the motion for severance.

### III. THE REQUESTED INSTRUCTION.

 At the conclusion of arguments to the jury, appellants tendered, and the trial judge refused, the following instruction:

> "Count I charges that these Defendants conspired, or, in words, agreed together, to accomplish a particular purpose: the making of threatening interstate telephone calls to Robert Sunshine. A person cannot agree to a purpose unless he knows what that purpose is. Thus, as to each Defendant, you must be convinced beyond a reasonable doubt that he knew, understood, and desired that a threatening interstate call or calls would be made. If you cannot make this finding as to any Defendant, you must acquit him on Count I."

Being mindful of the principle that no error will be found in failure to give a requested instruction if the legal subject matter of the request is in fact cov-

ered in the trial court's general instructions, appellants assert that, as given, the general instructions failed to apprise the jury of an essential element of the offense charged in the first count of the indictment, i. e., the element of an agreement to use interstate telephone communications. Appellants submit that the jury, under the instructions it received, could have convicted them not only on the theory of threatening communications by interstate telephone, but also on the theory that two of them (Kolod and Alderman) sent a threatening communication through the third (Alderisio) by interstate travel. In essence, the complaint is that the jury was not made to focus upon the particular form of interstate transmission charged under 18 U.S.C. § 875(c).[3]

A careful reading of the trial judge's instructions to the jury reveals a commendably thorough and definitive exposition of the statutes and charges involved. Logically, inasmuch as both counts of the indictment charged interstate transmission of threats by telephone, the court delayed until conclusion of a full discussion of the applicable statutes to state:

> "[T]he transmission of a telephonic conversation by telephone wires from one state to another state constitutes transmission in interstate commerce of a communication within the meaning of the *statute* upon which the indictment in this case is based." (Emphasis added.)

Although they implicitly agree that this portion of the general instructions covers the legal import of their requested instruction, appellants urge that use of the word "statute" in the singular, plus the location of this one reference to telephone communications far removed from the specific instructions on Count One of the indictment, would lead the jury to believe that Count One related

3. 18 U.S.C. § 875(c), one of the statutes *under which appellants were convicted,* reads as follows:
"Whoever transmits in interstate commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

to an agreement to transmit threats in interstate commerce by any means, telephone or otherwise.

While the diligence of appellate counsel in presenting this issue is impressive,[4] we cannot agree that either the form or format of these general instructions represent reversible error. First, since each count of the indictment rested upon a common section, albeit different sub-sections, of Title 18 of the U.S.Code, and since each sub-section employed identical phraseology in defining the federal crimes charged, the use of the singular noun "statute" in referring to interstate communications by telephone was both understandable and proper. Second, the government's entire case was built around telephone communications. Nothing in the record would suggest that either the court, the jury, the government, or the defense ever had anything but telephone communications in mind. Indeed, there is nothing in the record that would support a conviction for threatening communications by any means except the telephone. The general instructions given were, on the whole, exhaustive and completely fair. Accordingly, we reject the speculation of appellants that the jury might have been in some way misled into convicting them for a crime other than that charged in the indictment.

## IV. ALDERISIO'S MOTION FOR ACQUITTAL.

On two occasions during the trial, first at the conclusion of the government's case and then at the conclusion of the presentation by the defense, appellant Alderisio moved for judgment of acquittal. Both motions were summarily denied by the trial court. Alderisio contends in this appeal that he was entitled to acquittal as a matter of law on the ground that the record evidence failed to connect him with the federal element of the offense for which appellants Kolod and Alderman were convicted, i. e., the agreement to use interstate communication facilities for the unlawful purpose of making threats. Without proof of his complicity in the interstate nature of the threats, it is urged, there is no support for Alderisio's conviction for a federal crime.

Where federal criminal jurisdiction is based upon the presence of an interstate transaction or occurrence, it is necessary only that the evidence provide an inference that the defendant could have reasonably anticipated the interstate ramifications of his wrongful conduct or the wrongful conduct of those with whom he has associated. See, e. g., Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; United States v. Kierschke, 6 Cir., 315 F.2d 315, and authorities cited therein. In the instant case, however, the inferences from the record far transcend the realm of Alderisio's mere reasonable anticipation. As the very instrument of force by which Kolod and Alderman had persistently assured Sunshine they would carry out their threats, Alderisio was an essential element of the conspiracy. His brief reign of terror in Sunshine's office, coupled with his initiation of an interstate telephone call to Kolod and Alderman in Monticello, New York, was a clear indication of his active participation in and knowledge of the agreement to transmit threats from one state to another. The motions in Alderisio's behalf for judgment of acquittal were properly denied.

Affirmed.

4. Although absence of an instruction on an essential element of the offense charged may be "plain error" under Fed.R.Crim. P. 52(b), we note that defense counsel never objected at the trial to any particular aspect of the general instructions as such, but merely reiterated their general objection to the trial judge's refusal to include their requested instruction. See Fed.R.Crim.P. 30.