UNITED STATES of America,
Appellee,

v.

Charles CACI, also known as Bobby Milano, Stephen A. Cino, Pasquale A. Natarelli, also known as Pat Natarelli, Frederico G. Randaccio and Louis Sorgi, Defendants-Appellants.

No. 511, Docket 32036.

United States Court of Appeals
Second Circuit.

Argued June 18, 1968.

Decided July 30, 1968.

Paul Ivan Birzon, Buffalo, N. Y., for appellant Caci.

Peter L. Parrino, Buffalo, N. Y., for appellant Cino.

Salten Rodenberg, Buffalo, N. Y., for appellant Natarelli.

Frank G. Raichle, Buffalo, N. Y. (Herald Price Fahringer, Buffalo, N. Y., on the brief), for appellant Randaccio.

Joseph P. Runfola, Buffalo, N. Y., for appellant Sorgi.

Andrew F. Phelan, Asst. U. S. Atty. (Thomas A. Kennelly, Acting U. S. Atty. for Western District of New York, Thomas H. Henderson, Jr., and Gary L. Gardner, Attys., Department of Justice, on the brief), for appellee.

Before MOORE and HAYS, Circuit Judges and TIMBERS, District Judge.*

HAYS, Circuit Judge:

Appellants Charles Caci, Stephen A. Cino, Pasquale A. Natarelli, Frederico G. Randaccio and Louis Sorgi, were convicted, upon a trial by jury, of conspiring to commit a robbery which would affect commerce in violation of 18 U.S.C. § 1951 and conspiring to transport stolen goods in interstate commerce in violation of 18 U.S.C. §§ 371 and 2314. We

* Of the District Court for the District of Connecticut, sitting by designation.

have considered the many assignments of error which have been advanced by appellants and have found no ground for reversal. The judgments of conviction are affirmed.

The indictment charged in the first count that appellants conspired to rob an armored car messenger at a Los Angeles hotel in violation of 18 U.S.C. § 1951 and in the second count that appellants conspired in violation of 18 U.S.C. § 371 to transport in interstate commerce proceeds from the sale of jewelry which they planned to steal from a wealthy guest at the hotel. Neither of the planned robberies was executed because the guest did not come to the hotel as expected. But for the decision of Pascal Calabrese, a co-conspirator, to "cooperate" while awaiting sentence on another charge, appellants' plans probably would never have come to the attention of law enforcement officials.

Calabrese, the chief government witness at trial, testified in great detail to the following. On December 29, 1964 Calabrese robbed the Buffalo City Hall of a substantial amount of money and immediately went into hiding. A few days later Stephen Cino contacted him at a Buffalo motel and told him that "Pat" [Natarelli] and "Freddie" [Randaccio] wished to see him. A meeting was arranged for the following evening, February 5, at Natarelli's house. When Calabrese arrived at the house he found Cino and Natarelli already there. They told him that they had "a couple of good scores" for him out of town. About a half hour later Randaccio arrived, and Natarelli and Randaccio explained their plans in detail.

Calabrese was to go to Los Angeles where he would be met by Charles Caci, an entertainer who used the stage name of Bobby Milano. A couple of days later Cino would join them. Caci would introduce Calabrese to Louis Sorgi, who was in charge of security at the Beverly Hilton Hotel. Calabrese would commit two robberies at the hotel. He would rob Mrs. Walker McCune, a frequent guest at the hotel, of her jewelry which

was reputed to be worth $400,000. Then he would rob the armored car messenger who visited the hotel to pick up the daily receipts. The jewelry would be taken by Cino to his uncle in San Francisco, who would "fence" it, and the proceeds would be returned to Buffalo.

It was agreed that Calabrese would have some friends drive him to Pittsburgh where he would get a flight to Los Angeles. At the conclusion of the meeting Natarelli and Randaccio gave Calabrese several hundred dollars for expenses.

When Calabrese arrived at the airport in Los Angeles, Caci was there to meet him. While driving from the airport to Caci's apartment they passed the Beverly Hilton, which Caci identified as the site of the "scores." Caci obtained an apartment for Calabrese in the building in which he lived. A few days later, on February 10, Cino arrived. On that evening Caci, Cino and Calabrese went to Sorgi's home where they discussed plans for the robberies. The next day Sorgi took Calabrese on a tour of the Beverly Hilton. They visited the suite usually occupied by Mrs. McCune and made a careful study of the tunnel used by the armored car messenger. Calabrese then left the hotel with Caci and Cino and went over the planned escape route. When they reached Calabrese's apartment, Calabrese commented that it was amazing that Sorgi had the keys to the entire hotel. Caci displayed a key that he said would open all the doors Sorgi had opened at the hotel.

Mrs. McCune was expected to arrive at the hotel on the following day, but she did not. For the next several days Caci telephoned Sorgi frequently to determine whether Mrs. McCune had come. On February 17 Cino received a telephone call from Buffalo and told Calabrese that his, Calabrese's, connection with the City Hall robbery was known to the police and that he, Cino, had been instructed to return to Buffalo lest he be found with Calabrese. Cino then left for Buffalo. Five days later Calabrese

surrendered to the authorities in Buffalo.

Calabrese's testimony, only the highlights of which have been summarized here, was corroborated in many details by evidence as to hotel reservations, room rentals, and the like. Evidence that Beverly Hilton passkeys had been found in Caci's possession when he was arrested on another charge provided important support for Calabrese's story.

The government introduced evidence to show that the robbery of the messenger from Armored Transport, Inc. of the pouch containing cash and checks for delivery to the United California Bank would have affected commerce. Hotel records for February, 1965 revealed that fifty-nine percent of the checks cashed at the hotel were drawn on out of state banks. During the same period 1,150 American Express Travelers Checks were cashed at the hotel. Other evidence indicated that both the bank checks and the travelers checks moved in interstate commerce in the course of collection procedures.

### 1. Construction of Hobbs Act

■ Appellants claim that the first count of the indictment should have been dismissed because the Hobbs Act, 18 U. S.C. § 1951, was not intended to cover the kind of robbery they were accused of plotting. Cino contends that Section 1951 applies only to cases of extortion,

although Caci is willing to concede that it might apply to "highway" robbery as well. In light of the clear wording of the statute outlawing "robbery or extortion" [1] which affects commerce, it is not surprising that appellants spend little time on analysis of the statutory language and place primary reliance on the legislative history. However, as we recently have had occasion to observe, "the proper function of legislative history is to solve and not to create an ambiguity." United States v. Blasius, 397 F.2d 203 (2d Cir. July 8, 1968), (citations omitted).

But, in any case, the legislative history does not support appellants' position. The Hobbs Act is the successor to the Anti-Racketeering Act of 1934. Section 2(a) of the 1934 Act in substance made it unlawful to obtain or attempt to obtain money or property by the use of force or threat of force in connection with any act affecting interstate commerce. Specifically excepted from the operation of the section was "the payment of wages by a bona-fide employer to a bona-fide employee." In United States v. Local 807, Teamsters Union, etc., 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942), the Supreme Court read the exception very broadly to include the exaction from out of state truckers by means of threats of violence of payments equivalent to union wages, when the truckers declined to employ members of the local union to drive their trucks on that portion of

1. 18 U.S.C. § 1951 (1964):
  "Interference with commerce by threats or violence.
    (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
    (b) As used in this section—
    (1) The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.
    * * * *"
  This definition of robbery was taken from the definition in the New York State statutes. See 91 Cong.Rec. 11843 (1945) (remarks of Rep. Michener); 91 Cong.Rec. 11906 (1945) (remarks of Rep. Robsion).

their routes occurring within the local's territory. The Hobbs Act was passed for the purpose of overruling this case. See H. R. Rep. No. 238, 79th Cong., 2d Sess. (1945), reprinted in U. S. Code Congressional Service pp. 1360–70 (1946). Thus, appellants are undoubtedly correct that the motive of Congress in enacting this legislation was to curb the kind of labor racketeering to which appellants would limit the reach of the statute.

However, the legislative history clearly indicates that Congress deliberately enacted a broad statute designed to apply to *all* robbery and extortion which affected commerce. The Hobbs Act was opposed by many who viewed it as specifically intended to hamper the legitimate activities of organized labor. See, e.g., 91 Cong.Rec. 11848 (1945) (remarks of Rep. Lane); 91 Cong.Rec. 11901 (1945) (remarks of Rep. Celler). In response, supporters of the measure were able to point out that its prohibitions were applicable to all individuals and groups, see, e.g., 91 Cong.Rec. 11844 (1945) (remarks of Reps. Robsion and Michener); 91 Cong.Rec. 11904 (1945) (remarks of Rep. Gwynne); 91 Cong.Rec. 11905 (1945) (remarks of Rep. Robsion), that the activities proscribed —robbery and extortion—traditionally were regarded as criminal under state law, see, e.g., 91 Cong.Rec. 11910 (1945) (remarks of Reps. Springer and Robsion), and that the borrowing of state law definitions in the statute provided assurance that the terms robbery and extortion would not be extended beyond their established meanings, see, e. g., 91 Cong.Rec. 11900 (1945) (remarks of Reps. Hancock and Hobbs). Throughout the debates, advocates of the Hobbs bill sought to characterize it as a traditional criminal statute neutral in its application. So interpreted, the Hobbs Act plainly covers the theft contemplated by appellants.

In United States v. De Sisto, 329 F.2d 929 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), we affirmed the conviction under the Hobbs Act of a defendant guilty of a crime similar to that planned by appellants. De Sisto was accused of hijacking a truck loaded with silk from Japan by means of threats of violence addressed to the driver. No elements of labor racketeering or extortion were in any way present.

Randaccio also argues that the Hobbs Act is inapplicable because checks in the possession of the armored car messenger would not yet have been moving in interstate commerce. This argument is without merit. In the first place, the language in the Act relating to interstate commerce is extremely broad, "manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed. 2d 252 (1960). It is sufficient under the Act that the proposed robbery would "affect" commerce. Furthermore, it is clear that the checks would have begun their journey in interstate commerce at least as soon as they were delivered by the hotel to the employee of Armored Transport, Inc., operator of an independent messenger service. See United States v. Sherman, 171 F.2d 619, 622–623 (2d Cir. 1948), cert. denied sub nom. Grimaldi v. United States, 337 U.S. 931, 69 S.Ct. 1484, 93 L.Ed. 1738 (1949); United States v. Fox, 126 F.2d 237 (2d Cir. 1942).

### 2. Accomplice Testimony

Appellant Cino attacks the sufficiency of the evidence, apparently on the ground that the uncorroborated testimony of an accomplice is insufficient to support a verdict. Although Calabrese's testimony was of crucial importance, it did not stand alone; as noted above, it was corroborated in several respects. Moreover, even if his testimony were not corroborated, it would be sufficient to support the convictions. See Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917); United States v. Agueci, 310 F.2d 817,

833 (2d Cir. 1962), cert. denied, 372 U.
S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11
(1963).

#### 3. Effect on Interstate Commerce

Appellant Natarelli contends that the
proof with respect to effect on inter-
state commerce was insufficient because
it was limited to February, 1965 while
the robbery of the messenger was not
definitely scheduled for that month.
However, the evidence clearly establishes
that appellants intended to execute this
robbery in February. The messenger
was to be robbed shortly after the theft
of Mrs. McCune's jewelry; Mrs. McCune
was to be robbed shortly after she ar-
rived at the hotel. And Mrs. McCune
was expected to arrive on or before Feb-
ruary 12.

#### 4. Knowledge of Transportation in Interstate Commerce

Appellant Caci argues that there was
no evidence from which the jury could
conclude that he knew that the proceeds
of the jewel theft were to be transported
in interstate commerce. We find ample
evidence from which the jury could draw
this inference. Caci was intimately in-
volved in the preparations for the theft
and this fact alone provides sufficient
basis for inferring that he knew how
the proceeds would be disposed of. Caci
knew that Randaccio and Natarelli were
directing the operation from Buffalo;
he must have known that they would re-
ceive their share in Buffalo.

#### 5. Charge on Defense of Alibi

Randaccio claims that the trial
court erred in refusing his request for a
charge as to the burden of proof on his
alibi defense. We hold that, in the cir-
cumstances of this case, the failure to
give the charge requested did not consti-
tute reversible error.

The basis of the alibi defense was
provided by information in government
electronic surveillance logs as to Randac-
cio's whereabouts on the night of the al-
leged meeting at Natarelli's house. This
information was transmitted to the jury
in the form of the following stipulation:

"The government and the defendant,
Frederico Randaccio stipulate that on
February 5, 1965, a witness, who is not
being called to testify, was in a position
to overhear, but not see, certain activi-
ties in an apartment in the City of Buf-
falo. That apartment, occupied by a
person who is not a defendant in this
case, is located approximately nine-
tenths of a mile from 60 Manchester
Place [Natarelli's address]. At 7:50 P.
M. on that evening, Frederico Randaccio
was heard arriving at the apartment and
talking to the occupant of that apart-
ment. The TV, which had been turned
on, was then turned up louder. Continu-
ous loud TV ensued for the balance of
the evening, during which no other
sound, movement or conversation was
heard indicating whether Frederico Ran-
daccio remained or left the premises."
There was also evidence that Randaccio
suffered from a hearing defect the vic-
tims of which frequently turn up the
volume when watching television.

Trial counsel for Randaccio sought an
instruction indicating in substance that
if the alibi proof when considered with
the other evidence raised a reasonable
doubt as to his guilt, Randaccio would
be entitled to an acquittal. Apparently
it was thought that such an instruction
would prevent the jury from erroneously
believing that the burden of establishing
the alibi defense was on the defendant.
However, both the manner in which this
request was made and the manner of ob-
jecting to its denial gave the trial court
little opportunity for the reflection and
deliberation which compliance with the
provisions of Fed.R.Crim.P. 30 is de-
signed to provide.

Rule 30 requires that written requests
to charge be filed at the close of the evi-
dence "or at such earlier time during
the trial as the court reasonably directs."
In accordance with the trial court's
instructions, counsel submitted requests
in advance, including twenty-five re-
quests on Randaccio's behalf. The trial
judge informed counsel of his disposi-
tion of the requests four days before he
was to charge. At that time trial coun-

sel for Randaccio indicated that he was preparing supplemental requests which would be ready later that day. The judge stated that he wished to have them as soon as possible. The additional requests were not presented until fifteen minutes before the judge began delivering his charge. At that late hour, see United States v. Olweiss, 138 F.2d 798, 800 (2d Cir. 1943), motion for leave to file a petition for certiorari *nunc pro tunc* denied, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1944), counsel submitted four additional requests, of which the alibi request was the second.

Having given the court only the barest opportunity to consider the alibi request in advance, counsel compounded the delict by inadequately objecting to the failure to charge as requested. Rule 30 requires that counsel state "distinctly the matter to which he objects and the grounds of his objection." At the conclusion of his charge the trial judge gave the reasons for his refusal to charge the additional requests and stated, "You have, of course, an exception." Counsel presented detailed objections to other portions of the charge, but made no mention of the alibi request.

■ Ordinarily the failure to give an instruction on alibi defense will not be considered absent a proper request. See United States v. Tramaglino, 197 F.2d 928, 932 (2d Cir.), cert. denied, 344 U.S. 864, 73 S.Ct. 105, 97 L.Ed. 670 (1952); Goldsby v. United States, 160 U.S. 70, 77, 16 S.Ct. 216, 40 L.Ed. 343 (1895). Assuming that in some circumstances the failure to give such a charge might constitute "plain error," see Fed.R. Crim.P. 52(a), this is hardly such a case. The alibi offered was far from compelling. Calabrese's testimony indicated that Randaccio arrived at Natarelli's place at about 8:30 or 9:00 p. m. There is nothing in Calabrese's story which is inconsistent with Randaccio's being nine-tenths of a mile away at 7:50. Under these circumstances, the court's comprehensive charge on reasonable doubt, which included the statement that the burden of proof "rests with the

Government at all times" and "never shifts to a defendant," was adequate.

### 6. Evidentiary Rulings

■ Caci contends that the admission of evidence to show that certain of his recent checks had been returned for insufficient funds was prejudicial as showing the commission of other crimes. We hold that the evidence was admissible to rebut evidence of Caci's· good character. Although no character witnesses were presented, Caci's counsel cross-examined Calabrese about Caci's appearances on popular television shows and introduced a brochure which included a photograph of Caci in the company of a well-known entertainer. The bad check evidence also tended to show that Caci lacked funds and thus had a motive to participate in the planned thefts. This has particular significance in view of the testimony from which the jury might have gathered that Caci was a highly paid entertainer. Finally, it is difficult to see how this evidence could have seriously prejudiced Caci, particularly since the evidence also showed that the checks subsequently had been redeposited and paid.

■ Caci also argues that the Beverly Hilton passkeys found in his motel room were seized in violation of his fourth amendment rights and should not have been admitted into evidence. His argument seems to be that the trial court erred in crediting the government's witnesses who stated that Caci voluntarily admitted the police officers to the room rather than crediting Caci's witnesses who testified that the officers broke down the door. Of course we are in no position to contradict the trial judge's determinations as to the credibility of witnesses whom we have not seen. See United States v. Vita, 294 F.2d 524, 528 (2d Cir. 1961), cert. denied, 369 U. S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962).

■ It is also claimed that the officers learned of the keys through interception in violation of 47 U.S.C. § 605 of a telephone conversation between one

Fitzgerald and appellant Sorgi. Since Fitzgerald, the caller, gave the officers permission to listen in on the conversation, there was no violation of Section 605. See Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957).

■ Natarelli claims that evidence that the robbery would obstruct the interstate movement of checks was inadmissible under Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), because the indictment charged only that the robbery would obstruct the interstate movement of money. The claim is frivolous.

### 7. Jury Selection

■ Randaccio objects to several features of the jury selection process in the Western District of New York. About one-half of the names for the federal jury box are obtained from state jury lists. Concerning the prospective jurors so obtained, Randaccio has two objections: (1) the primary sources used by the state jury selectors are voter registration lists, so that non-voters are under-represented, and (2) New York law permits women to claim exemption from jury service, so that women are under-represented. Neither of these objections is substantial. It is well established that the use of voter registration lists as the source of names of prospective jurors is not unlawful because it results in the exclusion of non-voters. See, e.g., United States v. Kelly, 349 F.2d 720, 778 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); United States v. Agueci, 310 F.2d 817, 833–834 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S. Ct. 1013, 10 L.Ed.2d 11 (1963). Indeed, voter registration lists are made the primary source of jurors in the new Jury Selection and Service Act of 1968, 28 U. S.C.A. §§ 1861–1871 (Supp. July, 1968). As to the representation of women, it is significant that three women served on the jury which convicted appellants. Since only one-half of the federal jurors are taken from the state lists and since women are represented in substantial (albeit unequal) numbers on the state lists, the under-representation of women on the federal juries is minimal. We note also that the constitutionality of the New York statute permitting women to claim exemption has been sustained. Fay v. People of State of New York, 332 U.S. 261, 277–278, 67 S.Ct. 1613, 91 L. Ed. 2043 (1947). See also Hoyt v. State of Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L. Ed.2d 118 (1961).

■ One-half of the names in the federal jury box in the Western District are selected by a federal jury commissioner using a variety of methods, including the "key-man" system. As to these, Randaccio complains that the commissioner has no authority to reject jurors as unqualified except on the grounds set forth in 28 U.S.C. § 1861 (1964). The jury commissioner testified that he did not place in the jury box the names of persons whose answers to a questionnaire indicated that they were of low mentality. It is arguable that Section 1861(3) specifically authorizes the commissioner to reject such persons as "incapable, by reason of mental * * * infirmities to render efficient jury service." In any event, it is settled in this Circuit that a jury commissioner has discretion under 28 U.S.C. § 1864 (1964) to reject prospective jurors as not "qualified" for reasons other than those listed in Section 1861. See United States v. Flynn, 216 F.2d 354, 386–388 (2d Cir. 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955).

### 8. Motion for Severance

■ Caci's motion under Fed.R. Crim.P. 14 for a severance in order that he might have the benefit of Sorgi's testimony in his behalf and his alternative motion for permission to inform the jury that he had attempted to call Sorgi as a witness were both properly denied. As to the former, "The argument is unrealistic. There is no reason to think that a co-defendant would be any more willing to waive his constitu-

tional privilege against self-incrimination when called as a witness at a separate trial than he would be willing not to insist upon his privilege as a defendant not to take the stand." Gorin v. United States, 313 F.2d 641, 645–646 (1st Cir.), cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963). And had counsel for Caci been permitted to comment on Sorgi's refusal to take the stand, Sorgi's rights under the fifth amendment would have been violated. See, e.g., United States v. Echeles, 352 F.2d 892, 898 (7th Cir. 1965); De Luna v. United States, 308 F.2d 140 (5th Cir. 1962), petition for rehearing denied, 324 F.2d 375 (1963). We are aware that these cases also appear to hold that the inability of a defendant to comment on a co-defendant's refusal to take the stand in a joint trial is sufficient to require a severance. Subsequent cases, however, have read *De Luna* and *Echeles* narrowly, confining their application to cases in which a defendant can show "real prejudice" if he is not permitted to comment on the silence of a co-defendant. United States v. Kahn, 381 F.2d 824, 840 (7th Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967). See Smith v. United States, 385 F.2d 34, 37–38 (5th Cir. 1967); Kolod v. United States, 371 F.2d 983, 990–991 (10th Cir. 1967), vacated on other grounds, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968); Hayes v. United States, 329 F.2d 209, 221–222 (8th Cir.), cert. denied sub nom. Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964). See also United States v. McKinney, 379 F.2d 259, 264–265 (6th Cir. 1967). No such prejudice has been shown here.

### 9. Other Points

The remaining contentions do not require extended comment.

■ a. Natarelli's claim that the second count should have been dismissed because one cannot be guilty of conspiring to transport stolen goods "knowing them to have been stolen" under 18 U.S. C. § 2314 until the goods have in fact been stolen is without merit. Cf. Williamson v. United States, 207 U.S. 425, 446–447, 28 S.Ct. 163, 52 L.Ed. 278 (1908).

■ b. Since no objection was taken below we do not consider Cino's argument that he was deprived of his constitutional right to be present at every stage of his trial by the holding of numerous conferences in his absence in the judge's chambers. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S. Ct. 887, 15 L.Ed.2d 663 (1966).

■ c. Caci contends that the district court erred in refusing to recall the jurors seven days after the verdict to learn whether any of them had heard and had been influenced by radio broadcasts on the evening prior to and on the morning of the charge referring to three of the defendants as having been linked to the Cosa Nostra. In view of the limited character of the publicity and the repeated and detailed admonitions by the court to the jury to refrain from listening to the radio, the court did not abuse its discretion in refusing to recall the jury. Cf. United States v. Hoffa, 367 F.2d 698, 715 (7th Cir. 1966), vacated on other grounds, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967).

d. Finally, appellants raise three objections to the jury charge, none of which we find to have merit.

■ The court charged with respect to accomplice testimony as follows: "such testimony is to be given close and searching scrutiny and is to be received with caution and weighed with great care. You should not convict a defendant on the unsupported testimony of an accomplice unless you believe the unsupported testimony beyond all reasonable doubt." Far from being inadequate, this charge was more favorable to appellants than was required. See United States v. Mattio, 388 F.2d 368 (2d Cir. 1968).

■ The court did not err in instructing the jury that a change in the form of the stolen property was not fatal in a prosecution for interstate trans-

portation under 18 U.S.C. § 2314. See United States v. Walker, 176 F.2d 564, 566 (2d Cir.), cert. denied, 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547 (1949).

The instruction that the defendants need not have intended to affect commerce in order to be guilty was entirely correct. See Nick v. United States, 122 F.2d 660, 673 (8th Cir.), cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550 (1941), cited with approval in United States v. Varlack, 225 F.2d 665, 672 (2d Cir. 1955). See also United States v. Pranno, 385 F.2d 387, 389–390 (7th Cir. 1967), cert. denied, 390 U. S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (1968).

Affirmed.