**UNITED STATES of America**
v.
**William Edward BEARD.**
**Crim. No. 14670.**

United States District Court,
M. D. Pennsylvania.

June 30, 1971.

S. John Cottone, U. S. Atty., Scranton, Pa., for plaintiff.

Arthur Kusic, Harrisburg, Pa., for defendant.

## MEMORANDUM

NEALON, District Judge.

Following the return of a jury verdict of guilty on two counts of interstate transportation of falsely made and forged checks, William Edward Beard moved for a new trial, challenging the identification of him by the Government's witnesses. Beard was indicted on September 16, 1969, together with Harold Garrison, for offenses occurring in York, Pennsylvania, on or about October 18 and October 20, 1966. Trial was held

between March 9 and March 11, 1970.[1] Garrison's motion for judgment of acquittal was granted on March 10, 1970, at the conclusion of the Government's testimony, but Beard's motion was denied. Beard's trial motion for suppression of the witness identification was also denied following a hearing outside of the presence of the jury.

The chronology of events developed at the trial were as follows:

On October 18, 1966, a check in the amount of $1,280.00, payable to Curtis Turner and signed by A. K. Brady was presented to Mrs. Phyllis L. Boyer, a Teller at the York Bank and Trust Company, York, Pennsylvania, and was cashed by her. On October 20, 1966, a check in the amount of $2,800.00, payable to Herman Jordan and signed by William A. Becker, was presented to Mrs. Cheryl L. Keener, a Teller at the same Bank and was similarly cashed by her. Both checks were cashed by the Tellers because they bore the initials of Robert Gordon, Assistant Manager of the Bank. Subsequently, on October 21, Mr. Gordon learned that the checks were invalid[2] and he so informed his Tellers to be on the lookout for checks bearing his initials. That same day a check containing Mr. Gordon's initials was presented to Mrs. Boyer and she immediately recognized the man presenting the check as the same one for whom she cashed the check on October 18. According to Mrs. Boyer, she remembered this man because he had previously left an impression on her because he was well-dressed, of very dark complexion, and had bulging eyes.[3] She excused herself in order to bring the check to Mr. Gordon and while doing this she pointed to the man who had presented it, whereupon the man ran out of the Bank and Mr. Gordon pursued him for a half block, but was unable to apprehend him.

On November 25, 1966, Special Agent Daane of the York Office of the Federal Bureau of Investigation displayed a group of photographs, including one of defendant, to Mr. Gordon, Mrs. Keener and Mrs. Boyer and all separately and independently identified defendant as the person who presented the checks for payment. That afternoon the three eyewitnesses were taken to Baltimore where they viewed five men in a lineup[4] and, once again, all three separately and independently identified defendant.

## LINEUP IDENTIFICATION

 Considering the Baltimore lineup identification of Beard by the Government witnesses, it is immediately apparent that the rule of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (right to counsel at lineups required for an accused in all instances occurring after June 12, 1967) has no application to the present case since the lineup occurred on November 25, 1966. Similarly, the rule of United States v. Zeiler, 427 F.2d 1305 (3d Cir. 1970) (right to counsel at pretrial photographic exhibition required for an ac-

1. Garrison and Beard had previously been convicted in this District, but the convictions were set aside because of a faulty indictment. United States v. Beard, 414 F.2d 1014 (3d Cir. 1969).

2. The initials of Mr. Gordon had been forged. He testified that Beard had appeared at the Bank previously and Gordon had initialed a small check for him which authorized the Tellers to cash the check. This particular check was never cashed, however, and the Government argued that defendant made tracings of the initials and transferred them onto the checks in question.

3. Mrs. Keener also stated that the man made an impression on her the day she cashed the check because he was well-dressed " * * * and we don't get very many well dressed negro people in our bank. They're usually dressed as regular working people from the factories and when Mr. Beard came in he was very well dressed, immaculately dressed. I also noticed that his eyes were outstanding on him and his complexion was very, very dark, one of the darkest I've seen on a Negro." (N.T. 183). Similar testimony was given by Mr. Robert Gordon. (N.T. 123).

4. Defendant Beard was in State custody at the time on State charges.

cused after he is in custody) has no application to the present case since the Wade rule is the keystone of the Zeiler decision. Rather, the proper test for determining Beard's lineup claim is whether the confrontation " * * * was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). Applying this test to the Beard lineup, I conclude that there was no due process of law violation. A photograph of the lineup is available and discloses that five persons participated in the lineup, all of whom were black, of the same size, with no glaring clothing inconsistencies. Furthermore, the lineup occurred while Beard was in the bona fide custody of the State of Maryland and there is no showing that the State was guilty of any collusion with the Federal Government in holding him. Indeed, the FBI's action in the case can only be termed "investigative." In these circumstances, the lineup was proper and did not violate Beard's constitutional rights.

## PHOTOGRAPHIC IDENTIFICATION

■ Beard contends that the lineup identification was tainted by the pre-line-up photographic exhibition held earlier that same day in York. He focuses on the fact that the photographs were shown to the witnesses several hours before the lineup while he was in custody and that the picture of him shown to the witnesses was inscribed "Baltimore

County Police." [5] This contention is governed by the principles enumerated in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).[6] First of all, an examination of the pictures used by the FBI reveals that eight of the nine pictures were mug shots with the usual identifying plate containing numerals, dates, and name of police department, so that this portion of Beard's argument is rejected. Secondly, the record of the hearing on Beard's motion to suppress establishes that the in court identification of Beard was not based upon any pretrial identification, photographic or lineup, but that the identifications were based upon the Government witnesses' own independent observation of Beard at the time of the commission of the crime. The testimony of these witnesses—Mrs. Boyer, Mrs. Keener and Mr. Gordon—was not altered at any time despite a thorough testing of their reliability by defense counsel. Based upon this evidence, I conclude that the photographic exhibition of the FBI several hours before the Baltimore, Maryland, lineup did not taint any subsequent identification of Beard, and their in court identification of Beard was based upon their own independent observation of Beard at the time he was in their presence in October, 1966. The photographic identification in this case was simply not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification of Beard.

### JURY INSTRUCTIONS

One final point remains. Counsel for Beard presented a request for instruc-

5. Beard originally contended that of the nine photographs shown to the witnesses, two were of him, thereby emphasizing his status in the investigation. He has since, however, abandoned this contention since the two pictures of the same person in the nine used by the FBI were of a man named Earl Leroy Bright. There were also two pictures of another man named Charles Francis Frazier. While the danger of suggestion or impropriety in photographic identification is great if one photo "recurs or is in some way emphasized," Simmons v. United

States, supra, at 383, 88 S.Ct. at 971, there is no such danger when the recurring photos are not that of the police subject.

6. * * * "(C)onvictions based on eyewitness testimony at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971.

tion to the jury on the morning of the final day of trial just prior to the Court's instructions to the jury. Closing arguments to the jury were concluded the previous afternoon. The point, dealing with the unreliability of identification evidence, was rejected by the Court as untimely. At the conclusion of the charge, the Court's prepared charge, including that portion pertaining to identification evidence, was not specifically objected to. However, after the jury had retired to deliberate, counsel for defendant entered a general objection to the charge.

■■ Rule 30 requires that " * * * (a)t the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests." Rule 30 further provides that "(n)o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Thus, not only is it clear that defendant's requested point for charge was untimely, see United States v. Caci, 401 F.2d 664 (2d Cir. 1968); Smith v. United States, 390 F.2d 401 (9th Cir. 1964); Schuermann v. United States, 174 F.2d 397 (8th Cir. 1949); but there was a failure to properly and timely object to the Court's charge. Moreover, the charge was more than adequate on the question of identification. The Court is never obliged to use counsel's language in its instruction and the point requested was a verbatim extract from the opinion in Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966), a practice which should be approached with caution. Cf. Curnow v.

West View Park Co., 337 F.2d 241 (3d Cir. 1968). In addition, the language requested in the point would more likely confuse the jury than enlighten it.[7] For these reasons, the defendant's assignment of error to the rejection of his requested point for instruction will be denied.

I find that the verdict of guilty was not against the evidence, the weight of the evidence and the weight of the law. Beard's motion for a new trial will accordingly be denied.

7. The point requested is as follows:
"1. Any identification process, of course, involves danger that the percipient may be influenced by prior formed attitudes; indeed, we are all too familiar with instances in which supposedly 'irrefutable' identifications were later shown to be incorrect. Where the witness bases the identification on only part of the suspect's total personality, such as height alone, or eyes alone, or voice alone, prior suggestions will have most fertile soil in which to grow to conviction. This is especially so when the identifier is presented with no alternative choices; there is then a strong predisposition to overcome doubts and to fasten guilt upon the lone suspect."