**UNITED STATES of America**
v.
**William A. HINES, Appellant.**

**UNITED STATES of America**
v.
**Theodore M. WARE, Appellant.**

Nos. 23281, 23391.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1970.

Decided Nov. 1, 1971.

As Amended Feb. 3, 1972.

Bazelon, Chief Judge, concurred in part and dissented in part and filed opinion.

————◆————

Mr. Michael J. Valder (appointed by this court) for appellant in No. 23,281.

Mr. William A. Jackson (appointed by this court) for appellant in No. 23,391.

Mr. John O. Clarke, Jr., Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., John A. Terry and Thomas C. Green, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

Convicted by a jury of two counts of robbery (22 D.C.Code § 2901), on this appeal appellants each raise a series of claims dealing with their apprehensions by the police, the identification procedures used by the police, and the conduct of their trial. We have carefully examined each of these claims and find them without merit.

I

On December 18, 1967, at approximately 2:20 P.M., two armed men entered the office of a realty company in the downtown area of the District of Columbia. Present in the office at that time were the president of the company, Mr. Walshe; three employees, Mrs. Ricketson, Mrs. Boggs, and Mrs. Heelen; and a contractor for the company, Mr. Gateau. When the gunmen entered, the three employees were located at desks in the front of the main office area behind a counter which separated that area from the office's entrance. Mr. Walshe and Mr. Gateau had just finished a conversation in the rear office of the company and were entering the main office area. The first gunman walked around the counter into the main office area, pushing Mrs. Ricketson aside in order to approach Mr. Walshe and Mr. Gateau. He asked the two men where the company's money was kept, and, without waiting

for an answer, ordered everyone to lie on the floor. When all five complied, he entered the rear office.

The second assailant ordered Mrs. Boggs to get off the floor and to open the safe. The first intruder then reentered the main office area, and pulled Mrs. Ricketson from the floor by her arm, instructing her to open a cash drawer which he had spotted under the counter. Mrs. Ricketson complied, placing the money located in the drawer in a paper bag which the robber had given her. The second gunman, who had been overseeing Mrs. Boggs' progress in opening the safe, left her side to force Mrs. Heelen from the floor in order that she might assist Mrs. Boggs. Apparently when Mrs. Boggs was left unattended at the safe, she had managed to trip a silent alarm. After a few more minutes, the safe was opened, and, as the two men were transferring money from the safe to a paper bag, a third man entered and announced the arrival of the police. All three men raced to the rear office where, through a rear window, they made a hasty exit to an alley, leaving behind the bags of money, a pistol, and several fingerprints. The robbery lasted approximately ten minutes.

Officer McFarland, the first policeman to arrive on the scene, entered the main office and was informed of the three men's exodus. He raced to the window in the rear office, viewed the three running down the alley, and climbed through the window in order to give chase. He was joined by Officer Frye. Both officers soon realized that the chase was futile and they returned to the scene of the crime, where investigation activities had been commenced by other officers.

A radio run was immediately sent out reporting the robbery. Officer Wilson first heard the report when he was traveling in his scout car approximately four blocks from the robbery scene. He immediately headed toward that location, and had traveled no further than two blocks when he observed two men running away from the robbery location and continuously glancing over their shoul-

ders in that direction. At an intersection Officer Wilson managed to block the path of one of the men with his car, but the other continued his flight, eventually turning up a nearby alley. Before Wilson could say anything, the first man opened the front door of the scout car and entered it, closing the door behind him. When asked by Officer Wilson why he had voluntarily entered the car, he responded that "[he was] tired of running." When asked what he was running from, no answer was forthcoming.

With the assistance of a fellow officer who had arrived in his own scout car, the man was removed from the car, patted down, handcuffed, and returned to the car. Officer Wilson then drove to the realty company where, by this time, police officers had assembled.[1] Officer Wilson brought the handcuffed suspect into the main office area where four of the five witnesses, all standing behind the counter, immediately and simultaneously identified him as one of the robbers.[2] Approximately ten minutes had passed since the three robbers had fled the office.

Detective Lanigan, one of the officers who had reported to the robbery scene, immediately recognized the detained man as appellant Hines, an individual he had encountered as a suspect in many other criminal matters. In addition, Detective Lanigan had once arrested appellant Hines's brother, Edward, for a pickpocketing offense. Realizing that appellant Hines' residence was merely three blocks from the scene of the robbery, and upon learning that all three of the robbers had initially fled in that direction, Detective Lanigan decided to visit that address in order to interrogate Edward Hines. Lieutenant Wallace accompanied him on this mission.

Upon arriving at the Hines home, approximately twenty minutes after the commission of the robbery, they were met by Officer Frye, who had been waiting in a one-man scout car across the

1. While the record is vague as to the exact number of police present, it appears that the number exceeded what might be considered the normal response to a robbery. The reason was that an erroneous "policeman-in-trouble" signal had been sent out.

2. The record makes clear that Mr. Walshe, Mr. Gateau, and Mrs. Ricketson identified appellant Hines. It is also fairly certain that Mrs. Heelen did not identify appellant Hines at that time. There is some controversy over whether Mrs. Boggs made such an identification. Detective Sergeant Reilly, who oversaw the entire investigation, and Mrs. Ricketson both testified at the preliminary hearing that Mrs. Boggs had not identified appellant Hines. However, prior to the grand jury hearing, Mrs. Boggs informed Sergeant Reilly that she had identified Hines at the show-up. Moreover, Officer Wilson testified at the evidentiary hearing that, when he first brought appellant Hines back to the scene of the crime, four witnesses had identified the suspect—two men and two women. Since Mrs. Heelen apparently made no identification, Mrs. Boggs must have been one of the two women. At trial, Officer Wilson specifically named Mrs. Boggs as one of the eyewitnesses who identified Hines. Mr.

Walshe also testified at trial that Mrs. Boggs had identified appellant Hines at that time. Finally, it is clear that Mrs. Boggs had the best opportunity to observe appellant Hines since he was supposedly the robber who stood by her side while she attempted to open the safe.

The judge presiding over the suppression hearing apparently gave credence to Officer Wilson and Mrs. Boggs since he stated in his findings that Mrs. Boggs had identified appellant Hines. The trial judge presiding over the trial reaffirmed that finding. There is ample evidence to support it.

After the witnesses had identified appellant Hines, Officer Wilson took him back into the front hallway, where he met Sergeant Reilly. Sergeant Reilly had not been able to observe the first confrontation, and he ordered Officer Wilson to take appellant Hines back into the main office area in order that he might have a "clear view" of the identifications. Prior to appellant Hines' reappearance, Sergeant Reilly asked the witnesses not to make their second identification until appellant was removed from the main office area. The witnesses then observed appellant's reappearance, waited until he was removed, and again made their identifications.

street from the residence in question. Officer Frye explained to Detective Lanigan that, after chasing the three robbers down the alley way, he had returned to the realty office to question the eyewitnesses. After receiving a partial description of the robbers, he began to cruise the area in his scout car. Eventually his attention was drawn to a Negro male wearing a black raincoat who appeared to meet the general description of one of the robbers.[3] He watched the suspect enter the front yard of a residence, engage in a conversation with an older woman, glance over his back at the scout car, and then enter the home. Officer Frye said that he was about to radio for help when Lanigan and Wallace arrived. Detective Lanigan told Frye of the arrest of appellant Hines and his suspicion that Hines was involved, and that the house into which Officer Frye had seen the suspect enter was the Hines residence.

The officers then approached the house. Appellant Hines' mother, the older woman Officer Frye had previously described, answered the door. Lieuten-

ant Wallace identified himself to Mrs. Hines and informed her that they were interested in talking to the man who had just entered the house. Mrs. Hines allowed the police officers to enter. Detective Lanigan observed a man at the top of the staircase place a black raincoat on a bannister and then descend the staircase. Lanigan, realizing this individual was not Edward Hines, asked the suspect for his name. He refused to answer, was placed under arrest, and was later identified as appellant Ware. Mrs. Hines also informed the officers that no other person was in the house at that time.

At 6:30 P.M., that same day, a lineup was conducted at police headquarters with a lawyer from Legal Aid present. The lineup consisted of four police officers, including Officer Wilson, and appellants. Three witnesses separately viewed the lineup, which was rearranged after it had been seen by the first of the three witnesses, Mrs. Ricketson. Both Mr. Walshe and Mr. Gateau recognized appellant Hines, while Mrs. Ricketson and Mr. Gateau identified appellant Ware.[4]

3. There is uncertainty as to the information Officer Frye possessed about the robbers at the time he began his investigation. He testified at the suppression hearing and at trial that he had forgotten the better part of the description which was given to him by the eyewitnesses prior to his patrol, but he did remember that he was looking for a Negro male of medium build wearing a black raincoat. Officer Frye insisted both at the evidentiary hearing and at trial that the description he had at that time was more detailed. The record provides support for the contention since it is undisputed that Officer Frye was responsible for sending out an early radio run which gave the partial description of the robbers. The text of that run was as follows:

"That's LOF #1 Negro male, 23, 5'9", 145 pounds, white shirt, tie, dark suit, dark coat, dark pants, #2 same general, one subject was apprehended, 2 subjects are still out #1 and #2 armed with a short black revolver, obtained an unknown amount of cash. No injuries."

Officer Frye conceded at trial, however, that he did not recognize that appellant

Ware was wearing a white shirt when he spotted him. Moreover, Officer Frye also admitted that he noticed no tie, dark suit, or dark pants on appellant. However, we can assume that Officer Frye noticed that appellant Ware matched the height, weight, and age descriptions emphasized in the radio run as well as the fact that he was a Negro male wearing a black raincoat. Appellant Ware, in his brief, attempts to disparage the significance of the black raincoat, stating that because it was raining on the day in question such a raincoat would certainly not be a distinguishing characteristic.

4. There was some confusion concerning Mr. Walshe's identification of appellant Hines at the lineup. Sergeant Reilly testified at both the preliminary and evidentiary hearing that Mr. Walshe had identified Ware at that time. However, at the evidentiary hearing, Sergeant Reilly's memory was refreshed when he was asked to view a copy of the "lineup sheet" which was completed after the eyewitnesses had made their identification. Typed on the sheet was a notation that Mr. Walshe had identified appellant Ware. That notation, however,

Mrs. Ricketson later explained at the suppression hearing that she did not identify appellant Hines because she believed that she was only to identify the suspect who had not been returned to the scene of the crime—an explanation confirmed by Sergeant Reilly, who was in charge of the lineup, at the suppression hearing. Mrs. Heelen was seriously shaken by the robbery incident and Mrs. Boggs had stayed at the realty office to assist her. In any event, at that time the police were under the impression that neither of these women could make an identification.

Prior to the lineup, one color photograph was taken of each appellant separately, and one of the two together. A photograph was also taken of the lineup as seen by Mrs. Ricketson, the first eyewitness to view it. Subsequently the police displayed these pictures to each of the witnesses in preparation for their testimony at various pretrial hearings. Mr. Walshe viewed the individual colored photographs prior to the suppression hearing, which was held nine and one-half months after the commission of the robbery. Mr. Gateau viewed both the individual pictures and the lineup photograph prior to the grand jury hearing, which was held less than a month after the robbery; and he saw the lineup photographs two or three times prior to his testimony at the suppression hearing. Mrs. Ricketson also viewed the individual photographs prior to her grand jury testimony and prior to the evidentiary hearing, and she testified at trial that she had viewed the photograph of the lineup approximately five or six times throughout the course of the various proceedings. Mrs. Boggs was shown individual pictures prior to testifying before the grand jury. At that time, she reported to the police that she volunteered to serve as an identifying witness before the grand jury.

At the suppression hearing appellants attacked the validity of their arrest and the various identification procedures. The judge presiding held both the arrests and the police lineup to have been proper. However, he found the on-the-scene identification of appellant Hines to be violative of the precepts established by the Supreme Court in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). He also held that Mrs. Boggs could not make an in-court identification of appellant Ware, because her viewings of the photographs violated the Supreme Court's decision in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and there was no demonstration of an independent basis upon which she could have made an in-court identification. The Government appealed the suppression of the show-up identification of appellant Hines, and after our decision in Russell v. United States, 133 U.S.App. D.C. 77, 408 F.2d 1280, cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969), this court, on the Government's motion, remanded the matter in order that the judge might reconsider his ruling. The confrontation was then held to be proper.[5]

was crossed out in pencil and written in was a fresh notation that Mr. Walshe had identified appellant Hines. Sergeant Reilly testified that an Officer Gould had filled out the lineup sheet and he recalled that at that time he had noticed that Gould had incorrectly depicted Walshe's identification. He checked with his own notes and discovered that Walshe had actually identified Hines. He reasoned that Gould's error was attributable to the fact that the participants in the lineup had been shifted around before Walshe made his identification. Therefore, Sergeant Reilly crossed out the original report and penciled in the correction.

Mr. Walshe consistently testified throughout the various proceedings that he had identified appellant Hines at the lineup. The judge presiding at the evidentiary hearing must have given credence to Mr. Walshe's and Sergeant Reilly's testimony, since he found that Mr. Walshe had in fact identified Hines at the lineup. There is substantial evidence to support such a finding.

5. The suppression hearing led to the charging of appellant Hines' brother, Edward, as the third intruder. Mrs. Boggs had been present at the two-day hearing in her capacity as a Government witness. Apparently, she had eyed Edward

At both the suppression hearing and the trial, each of the eyewitnesses gave detailed descriptions of the appearance and activities of appellant Hines at the scene of the crime. He was depicted as the second robber to enter the office. Only Mrs. Boggs, however, was able to give a detailed description of appellant Ware's activities on the day of the robbery. During direct examination at trial Mrs. Ricketson, Mr. Walshe, and Mr. Gateau testified that they had identified appellant Hines at the office show-up. Mr. Walshe and Mr. Gateau also testified that they had picked appellant Hines out out the police lineup. In addition, Mrs. Ricketson, Mr. Walshe, and Mrs. Boggs made an in-court identification of appellant Hines, whereas Mr. Gateau mistakenly selected appellant Hines as appellant Ware when he was asked to make an in-court identification. Mrs. Ricketson and Mr. Gateau testified additionally that they had selected appellant Ware at the lineup and Mrs. Ricketson also made an in-court identification of appellant Ware. On cross-examination, appellants elicited testimony from each of the witnesses as to their various photographic viewings of appellants. Finally, expert evidence was introduced that one of the fingerprints found at the scene of the crime was identical to a print of appellant Ware's left little finger.[6]

Appellant Hines moved to dismiss on the basis of a denial of a speedy trial. This motion was denied by the trial judge. Also denied were motions on behalf of both appellants to strike the testimony of all identification witnesses because transcriptions made of their statements at the scene of the crime by the police, with one exception, had not been turned over to appellant's counsel. This failure, it was argued, was a violation of the Jencks Act, 18 U.S.C. § 3500.

Both appellants also questioned the reliability of the eyewitnesses and police testimony by introducing prior statements made at previous hearings and Jencks statements as impeaching matter. Appellant Hines, who declined to take the stand at trial, introduced the testimony of three witnesses concerning his good character. Appellant Ware, who testified on his own behalf, presented an alibi defense, which was supported by Mrs. Hines.

---

Hines, who was present merely as a spectator, constantly during the first day of the hearings. She testified that they frequently engaged each other in staring matches. These staring contests supposedly resumed on the second day until Mrs. Boggs finally took the stand. On direct examination she was asked whether she had "ever seen the third man again?" She answered in the affirmative and proceeded to point to Edward Hines who was sitting in the front row of the spectators area.

Edward Hines was eventually charged with the robbery, arrested, and tried with appellants. The only evidence against him, aside from Mrs. Boggs' identification, was the testimony of Officer McFarland. He testified at trial that Hines was one of the robbers he had chased down the alleyway. However, Edward Hines presented a well-substantiated alibi that he was in Philadelphia when the robbery was committed. He was acquitted by the jury.

6. Six latent fingerprints were found at the scene of the crime and were eventually filed with the police records of this case. When appellant Ware was arrested, he was fingerprinted as part of the normal processing procedures. These fingerprints were also filed in the case record. The Government steadfastly proclaimed at all of the pretrial proceedings that it had no fingerprint evidence. However, due to what was described by the Government as a "reorganization" of the Metropolitan Police Department's Identification Bureau, it was learned immediately before trial that the Ware fingerprints had never been compared with the fingerprints found at the scene of the robbery. At that time, the prosecutor, who discovered the foul-up in his preparation for trial, asked the police department to examine the fingerprints found at the scene with those of appellants Hines and Ware. This examination was conducted on the morning of the trial. The police fingerprint expert concluded that one of the fingerprints found at the scene matched appellant Ware's fingerprint.

## A. The Detention and Arrest of Appellant Hines.

Appellant Hines argues that he was placed under arrest when his path was blocked by Officer Wilson's car, and that the arrest was invalid because the officer did not have the requisite probable cause to support such a detention. Alternatively, appellant argues that, even if he was only stopped due to "suspicious circumstances" at that time, he was arrested invalidly when he was handcuffed and placed back in the car for the purpose of being driven to the realty company for an on-the-scene identification. Appellant thus asserts that the on-the-scene identification, the lineup, and in-court identifications, all of which were directly attributable to the arrest, must be suppressed because they were the fruit of an illegal detention.

██ Even if it be assumed that probable cause to arrest was lacking at the point when Hines was first stopped by Officer Wilson, the result claimed does not follow. Police officers charged with the responsibility of patrolling our urban centers are not limited to the alternatives of either arrest or ignoring suspicious activity. If the activity of an individual reasonably suggests to an officer that criminal activity is afoot, he may temporarily detain that individual for the purpose of questioning. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We believe that Officer Wilson had the requisite degree of suspicion to make such a detention given the fact that he knew the robbery had been committed in the immediate vicinity, that appellant Hines was fleeing from the direction of the robbery, and that he was continuously glancing over his shoulder in that direction.

 Further, appellant Hines' unusual response to the investigatory stop magnified Officer Wilson's degree of suspicion to such an extent that at that point, we believe, he had the necessary cause to arrest Hines. Appellant Hines's voluntary entrance into the officer's scout car, and his statement that he was tired of running, when viewed in light of his prior behavior in the vicinity, were evidence from which a reasonable man could have believed that appellant Hines was involved in the robbery. See Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Bailey v. United States, 128 U.S.App.D.C. 354, 389 F.2d 305 (1967); Jackson v. United States, 112 U.S.App.D.C. 260, 302 F.2d 194 (1962).[7]

7. Appellant Hines raises two other claims which he believes support the contention that his arrest was invalid. First he notes that Officer Wilson, as he drove with appellant Hines back to the scene of the crime, received a radio run describing the robbers and that none of the descriptions matched appellant Hines' appearance at that time. Appellant Hines argues that whatever probable cause existed at that point vanished and he should have been released. The text of the radio run was as follows:

Cruiser 221, information of a holdup, an officer from Number 1. There are three of them I understand. The one with the blue jacket has been caught and there are two more Negro males, possibly in the late teens. One had a black coat on and the other had a blue suit and they are bare-headed and last seen going out the rear of the building.

It is true that appellant Hines did not meet either of these descriptions, but Officer Wilson had previously reported his detention of appellant Hines, and it is quite clear that these were descriptions of the other two robbers who were still at large. Furthermore, Officer Wilson clearly recognized that this was the case because he replied over the police radio: "Those are the ones I saw, wearing a light blue suit, went through the alley . . . Also the one in the raincoat." While it is unclear why Officer Wilson responded that he had seen two other individuals when all of his testimony indicated that he had only seen one, it is clear that Officer Wilson understood that these descriptions did not pertain to appellant Hines. Hence, his probable cause to arrest was in no way dissipated by the dispatch.

Second, appellant Hines points out that there is some indication in the record that Officer Wilson did not believe that he had arrested appellant Hines until he was identified at the scene of the crime. Appellant Hines argues that Of-

## B. The Arrest of Appellant Ware.

Appellant Ware also complains that his arrest was unlawful and that all evidence flowing therefrom should have been suppressed. In our analysis of the circumstances surrounding that arrest, we attach major significance to the fact that two independent police investigations converged at the residence in which Ware was found. As we have mentioned earlier, Note 3 *supra*, the partial descriptions given to Officer Frye, which he eventually sent out on a radio run, supplied him with identification indicia. On the basis of these descriptions, and prior to appellant Hines' return to the scene of the crime, Officer Frye set out to patrol the immediate neighborhood in search of the robbers. Within minutes of his departure he focused his attention on appellant Ware.

In the meantime, Detective Lanigan and Lieutenant Wallace had arrived on the scene of the crime in time to view appellant Hines being escorted into the realty company office by Officer Wilson. As Detective Lanigan entered the office he heard the spontaneous identifications of appellant Hines by the eyewitnesses, and he also recognized appellant Hines as an individual who had had several encounters with the law. Upon learning that three individuals were involved in the robbery, Detective Lanigan not unreasonably suspected that one of the robbers might be appellant Hines' brother, Edward, whom he had once arrested and who had been a constant companion of appellant Hines. Detective Lanigan's suspicions were reinforced when he also learned that all of the robbers had originally fled in the general direction of the Hines home, which he knew to be a mere three blocks from the scene of the crime. He and Lieutenant Wallace then decided to visit the Hines residence.

■ When they arrived, they found Officer Frye sitting in his scout car about to call for assistance. The three policemen proceeded to discuss their independent knowledge about the individual who had entered the Hines home. At that time, they knew that the individual had, in large part, fit the partial description given by the eyewitnesses moments after the commission of the robbery, and that he had entered the home of a man who had just been positively identified by four eyewitnesses as one of the robbers. Moreover, they knew that all of the robbers had initially fled in the direction of the house into which the suspect had entered. At that juncture, the officers had sufficient reason to believe that the individual had been involved in the crime.[8]

ficer Wilson must have believed that there was no probable cause to arrest appellant Hines when he handcuffed him and placed him in the back seat of a scout car. However, probable cause is not judged by an analysis of the subjective processes of the arresting officer. It is judged instead by learning what objective factors were at his command when he arrested a defendant and whether those factors, rationally viewed, amount to sufficient cause. *See* Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

8. Appellant Ware relies heavily upon this court's decision in Gatlin v. United States, 117 U.S.App.D.C. 123, 326 F.2d 666 (1963), as support for his contention that the police lacked probable cause to arrest him. In that case, the robber was described as a Negro of general characteristics, wearing a raincoat. One of-ficer, patrolling on foot the general neighborhood of the robbery scene, came upon a cab driver who informed him that he had just taken a suspicious looking character to a nearby gas station. The description of the passenger fit the partial description which the officer had been given. The officer proceeded to the gas station, but saw no one meeting the description. One hour later he met a fellow officer who was patrolling the same area in a scout car. The latter officer told him that he had just seen an individual meeting the description walking down a nearby street. The two proceeded to that street and arrested the defendant, who met the general description. The scene of the arrest was one and one-half miles from the scene of the robbery. We held that there was no probable cause for the arrest.

This case is distinguishable from *Gatlin.* While it is true that appellant Ware

Our examination of this matter is not at an end, however, for appellant Ware has claimed that the police officers entered the Hines residence without the consent of Mrs. Hines. The judge at the suppression hearing agreed with appellant Ware's assessment of the entry, but he determined that such an entry, under the totality of the circumstances, did not invalidate the arrest. We agree with that result. The record indicates that Mrs. Hines only allowed the officers into her house because she was embarrassed by their presence on her front steps, and we may assume for present purposes that her consent was less than voluntary. However, this court has had occasion to uphold an arrest which was the result of an unconsented entry, where the police have announced their authority and purpose, have possessed the requisite probable cause for arrest, have made certain that the right man has been arrested, and have demonstrated that immediate entry was imperative. *See, e. g.,* Chappell v. United States, 119 U.S.App. D.C. 356, 342 F.2d 935 (1965).

All of the above criteria have been satisfied in this case. The record makes clear that Lieutenant Wallace identified himself and the other police officers to Mrs. Hines, and informed her that they were investigating a robbery. The police had probable cause to arrest appellant Ware. In addition, after placing appellant Ware under arrest, the officers checked with Mrs. Hines to be certain that no other individual was present in her home at that time. Finally, had the officers taken the time to obtain a warrant, the chances of appellant Ware's escaping would have substantially increased. Officer Frye was aware of the fact that the suspect had already spotted

his scout car; and the officers could have legitimately reasoned that appellant Ware realized that he was under investigation and would flee if given the opportunity. Under these circumstances, we believe the police lawfully entered the Hines residence and that the subsequent arrest was valid.

### C. Identifications.

#### 1. The On-The-Scene Identification of Appellant Hines.

Appellant Hines argues that the show-up at the scene of the crime, conducted within minutes after his arrest, was violative of the Fifth and Sixth Amendments. *See* United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Appellant acknowledges that our decision in Russell v. United States, *supra,* found no infirmity in the practice of promptly returning a suspect to the scene of the crime for eyewitness identification. However, he argues that such a confrontation may be staged only in the event that exigent circumstances prevent the utilization of a line-up procedure. But *Russell* held that this type of confrontation violated neither *Stovall* nor *Wade,* due to the fact that the obvious dangers inherent in the procedure were more than balanced by the accuracy of fresh identifications. To a lesser extent, the court felt that prompt return to the scene would reduce unnecessary detentions of innocent suspects. Because of these advantages, no special or exigent circumstances were required to be shown before the police could utilize this procedure.[9]

---

met no more than a general description and was wearing a raincoat, his proximity in both time and place to the scene of the crime was far greater than was the case in *Gatlin.* In addition, due to the information provided by Detective Lanigan, the arresting officers also knew that Ware was entering the home of a man who had just been identified by four eyewitnesses at the scene of the

crime, and that the two other robbers involved in the crime had fled in the general direction of that residence.

9. There is some indication in the *Russell* opinion that because the confrontation was held at 5 o'clock in the morning, an immediate lineup was not possible and hence the more suggestive show-up was necessitated. *See* Russell v. United

Appellant also contends that an immediate confrontation can only be excepted from *Wade* and *Stovall* in situations where the police have a specific description of the suspect when he is placed under arrest, or where the suspect has been under uninterrupted surveillance by victims, witnesses, or the police from the moment the crime was committed until his apprehension. As support for this theory, appellant Hines points to a number of this court's opinions which have implemented the *Russell* doctrine and in which one of the two above criteria was present.[10] However, our review of this court's show-up cases suggests that, while such factual circumstances may tend to support the validity of the show-up identification, it has never been held that they are required in order to validate this procedure. In fact, an examination of the *Russell* decision itself reveals that there was no continuing surveillance of the suspect prior to arrest and, while the eyewitness was able to give the officer a detailed description of the suspect, the court lamented the fact that there had never been a determination of its accuracy. *See* Russell v. United States, *supra*, at 1285.

Appellant Hines finally maintains that the circumstances surrounding this identification were so chaotic that "special elements of unfairness" were present, thus making the procedure so unduly suggestive that it lost its shelter from the proscriptions of *Stovall*. *See* Russell v. United States, *supra*, at 1284. In support of this claim, appellant points to the unusual number of policemen present in the office at the time of the identification, because of the mistaken "policeman-in-trouble" call; the fact that appellant was handcuffed when brought before the eyewitnesses; the nervous state

of the eyewitnesses when they made their identifications; and the absence of counsel at the show-up.

The record supports the contentions that the witnesses, especially the women, were nervous at the time of the show-up, and that appellant Hines was wearing handcuffs when he was brought into the main office area. However, the *Russell* opinion, in upholding the validity of these show-ups, foresaw that such difficulties would arise. When balancing the competing considerations, the court said:

> Unquestionably, confrontations in which a single suspect is viewed in the custody of the police are highly suggestive. Whatever the police actually say to the viewer, it must be apparent to him that they think they have caught the villain. *Doubtless a man seen in handcuffs or through the grill of a police wagon looks more like a crook than the same man standing at ease and at liberty.* There may also be unconscious or overt pressures on the witness to cooperate with the police by confirming their suspicions. *And the viewer may have been emotionally unsettled by the experience.* [Emphasis added.]

*Id.* at 1284. Thus, something more egregious than nervousness on the part of the eyewitnesses and the presence of handcuffs on the suspect was contemplated when the court referred to "special circumstances of unfairness."

The record is unclear as to how many policemen were present in the office. Estimates ran between two or three to twelve. In any event, all of the eyewitnesses testified at trial that neither the additional police, nor their own nervousness for that matter, impeded their ability to recognize appellant Hines. In addition, all of the eyewitnesses and appel-

States, *supra*, 408 F.2d at 1283–1284. However, any weight which was intended to be given to this factor has been ignored in later decisions and heavy emphasis has been placed on the inherent reliability of prompt on-the-scene show-ups. *See, e. g.*, United States v. Washington, 144 U.S.App.D.C. 338, 447 F.2d

308 (1970) (show-up held at 10:45 A. M.)

10. *See, e. g.*, Jackson v. United States, 134 U.S.App.D.C. 18, 412 F.2d 149 (1969) (detailed description); Solomon v. United States, 133 U.S.App.D.C. 103, 408 F.2d 1306 (1969) (continuous surveillance).

lant Hines himself testified that the counter in the office blocked any view of appellant Hines' handcuffs.

▓ While *Russell* did not require counsel to be present at a show-up, it did suggest that such absence might be considered when viewing the suggestivity of the line-up in the "totality of the circumstances." However, given the fact that none of the other factors appear to have amounted to undue suggestiveness, we cannot say that the absence of counsel alone, in a situation where counsel is not required under the Sixth Amendment, invalidates the show-up in this case under the Fifth.

Finally, we note that the legitimacy of this identification is reinforced by each eyewitness's excellent opportunity to observe appellant Hines at the scene of the crime. There was undisputed testimony, both at the suppression hearing and at trial, that the lighting conditions in the realty office were very good. In addition, it was undisputed that appellant Hines was wearing no mask or any other object which would prevent an accurate identification. Mrs. Ricketson testified at trial that she had an excellent opportunity to observe appellant Hines when all of the female employees were with both assailants at the safe. Mr. Walshe testified that he observed Hines from his position on the floor, especially at the time appellant Hines forced Mrs. Heelen from the floor.[11] Mr. Gateau also testified that he had an opportunity to view appellant Hines from his position on the floor. Mrs. Boggs undoubtedly had the best opportunity to observe appellant Hines, since she had directed him to the safe and had spent several minutes with him while it was being opened.

▓ In sum, we do not believe that the confrontation was unduly suggestive, nor do we believe that it can successfully be distinguished from other situations in which *Russell* has been applied.

### 2. The Lineup Identification.

Both appellants contend that the lineup, conducted four hours after the commission of the robbery, was so unduly suggestive that it violated the Fifth Amendment. *See* Stovall v. Denno, *supra*. The standard by which we must judge this claim is whether the procedures employed at the lineup were "unnecessarily suggestive and conducive to irreparable mistaken identification." *Id*. at 388 U.S. 301–302, 87 S.Ct. at 1972. Such a determination must be made in view of the "totality of the circumstances" surrounding the identification. *Id*.

The primary complaint of each appellant is that there were noticeable physical disparities between themselves and the four police officers placed in the lineup. Both appellants were between 19 and 20 years of age, 5 feet 9 inches in height or shorter, 140 to 145 pounds or less in weight, and had no facial hair. The four police participants ranged in age from the late 20's to 40, in height between 5 feet 11 inches and 6 feet 2 inches, in weight between 160 pounds to 170 pounds and three of them wore mustaches. Both appellants assert that the suggestivity of the lineup was aggravated by the participation of Officer Wilson in the lineup—the policeman who had detained appellant Hines and brought him before the eyewitnesses. Appellant Ware adds that he was prejudiced since each of the eyewitnesses present at the lineup had viewed appellant Hines just a few hours earlier at the realty company.

▓ Our examination of the photograph of the lineup in the record before us suggests that, while the physical discrepancies between the appellant and the policeman seem impressive when expressed in terms of statistics, they fade when viewed as the lineup actually looked at police headquarters. We also note that the police were careful to dress all of the participants in the same garb, which

---

11. Mrs. Heelen was Mr. Walshe's sister. Mr. Walshe testified that he had taken particular notice of appellant Hines at this juncture because Hines had threaten-

ed to kill Mrs. Heelen if she refused to get off the floor in a more expeditious manner.

consisted of a black raincoat, an open white shirt, and dark pants.

With regard to the presence of Officer Wilson, each of the eyewitnesses testified at both the suppression hearing and at trial that they did not recognize him as the arresting officer of appellant Hines. This testimony is substantiated by the fact that he only appeared with appellant Hines at the scene of the robbery for short periods of time. In addition, he was wearing police headgear and uniform when he appeared with appellant Hines at the scene of the crime, but was more casually dressed for the lineup.

█ Appellant Hines' presence could not have seriously prejudiced appellant Ware since there were still four other unfamiliar faces present which eliminated any focusing upon Ware. It is significant in this regard that one witness picked Hines out of the lineup but not Ware.

It should also be noted that the police took precautionary measures to insure the validity of the lineup. Aside from providing similar garb, the police moved the participants around between the first and second viewing of the lineup in order to guard against communication between the witnesses.

Lastly, the validity of the lineup identifications is supported by the excellent opportunity the eyewitnesses had to observe both appellants. The lighting conditions in the realty company were very good, and Mr. Walshe and Mr. Gateau, the two eyewitnesses who identified appellant Hines at the lineup, both had an extended opportunity to observe appellant Hines. Additionally, we point out that, as in appellant Hines' case, appellant Ware made no attempt to hide his identity by using a mask or any other object.

Mrs. Ricketson and Mr. Gateau were the two witnesses who identified appellant Ware at the lineup. Mrs. Ricketson testified at trial that appellant Ware, whom she identified as the first assailant to enter the office, "was not actually out of [her] sight from the time he entered the office until he left, with the exception of a few short seconds. . . ." Mr. Gateau testified at trial that appellant Ware was the intruder who had approached Mr. Walshe and him as they were entering the main office area from the rear office. At that time, appellant Ware was three to four feet away from him and he had a full view of his face.

Viewing the totality of the circumstances relating to this lineup, we find it neither unduly suggestive nor conducive to irreparable mistaken identification.[12]

3. *Photographic Viewings of Appellants.*

In preparation for their testimony at the various pretrial proceedings, each of the eyewitnesses viewed photographs which depicted appellants separately, together, and in the lineup. Both appellant assert that these photographic showings violated the Fifth and Sixth Amendments. First, they contend that the showings were unduly suggestive, and, while evidence of them was not introduced by the Government at trial, they tainted the eyewitnesses' in-court identifications. *See* Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968). Second, appellants complain that these photographic showings in the absence of counsel abridged their Sixth Amendment rights.

Appellants cite Simmons v. United States, *supra,* as support for their contention that the exhibitions were unduly suggestive. *Simmons* was, however, concerned with eliminating suggestivity in

12. Legal Aid counsel present at the lineup, who became appellant Ware's counsel at trial, complimented the police on the fairness of the lineup after it was completed. This factor is somewhat diminished by the fact that he may not have known that Officer Wilson had returned appellant Hines to the scene of the crime for identification purposes. He gave some indication at trial, however, of having been aware, at the time of the lineup, of the fact that appellant Hines had been returned to the scene by the arresting officer.

the situation where photographs were being used by the police or prosecution to narrow a field of suspects. Mr. Justice Harlan, the author of the *Simmons* opinion, constantly refers therein to the hazards of *"initial* identification by photograph," and his fear that such procedures might lead to "an irreparable mistaken identification." Simmons v. United States, *supra*, 390 U.S. at 384, 88 S.Ct. 967 (emphasis supplied). We do not believe that once an eyewitness has made a positive identification, counsel's attempt to review that identification through the use of photographs in a preparatory session falls within the bounds of that case. Such an identification is neither "initial" nor is it likely to lead to a misidentification, since the witness has already identified the suspect in a constitutionally acceptable manner.

We note that each of the eyewitnesses testifying at trial had already made identifications at a valid showup or lineup prior to viewing the photographs. These eyewitnesses had established their ability to identify the suspects; the viewing of the photographs merely served to refresh their memories of the men they had previously chosen.

■■■ Appellants also argue that under *Wade* it was necessary that counsel be present during the photographic showings. But that decision indicates only that counsel must be present at those stages which are critical to the accused. Where, as here, positive identifications have already been made, the point at which the witnesses merely review their prior identifications cannot normally be considered a critical stage for Sixth Amendment purposes.[13] Such review by means of photographs does not taint an in-court identification, but may affect its weight if the defense chooses to develop the matter by cross-examination.

### D. Jencks Act Statements.

■■■ Appellants insist that the trial court's denial of their motion to strike the testimony of each of the eyewitnesses was reversible error. The motion was based on the Government's failure to produce the handwritten notes of the police officers who questioned the eyewitnesses at the realty company immediately following the robbery. Appellants argue that the police were required to produce these notes under the Jencks Act, which directs that, in order for the testimony to be admissible, the Government must give defendant "any statement" of a witness which relates to his testimony. 18 U.S.C. § 3500(b), (d).

At the outset we note that the testimony of one of the eyewitnesses, Mr. Walshe, cannot be at issue here due to his undisputed testimony at trial that no officer had taken notes about any statement he had made concerning the robbery. There was also no indication of any notes having been taken pursuant to the questioning of Mr. Gateau, a second eyewitness. Mrs. Ricketson, however, did testify on cross-examination at trial that she remembered speaking to a uniformed officer who took notes as she answered his questions. She also testified that Sergeant Reilly had conducted a more intensive interview with her at that time and had also taken notes. Mrs. Boggs also testified that she was questioned by Sergeant Reilly.

The trial court conducted a *voir dire* examination of Sergeant Reilly, who admitted that he had intensively questioned several of the eyewitnesses. However, he steadfastly maintained that all notes that he had taken pertaining to this questioning were general in nature. Sergeant Reilly added that he had destroyed his notes after they were used in the preparation of various police depart-

---

13. This court *en banc* has recently reversed, upon an appeal by the Government, the pretrial suppression by the District Court of identification testimony at trial. United States v. Brown, Proctor, and Williams (No. 24,452, order entered March 15, 1971). The District Court based its suppression upon the fact that the Government had, in an interview just prior to trial, shown to the witness a photograph of a lineup which the witness had attended and where counsel was present.

ment forms, all of which were tendered to appellants, along with grand jury testimony. Officers Casem and Frye also stated that they had made notations of various responses to questions made by the eyewitnesses. Officer Casem testified that he had only spoken with one witness, whom he was unable to identify at trial. He, too, stated that his notes were general in nature, that they had been incorporated into the police reports, and that, after a thorough search of his personal records, he was unable to locate them. Finally, Officer Frye testified that he had received only hurried descriptions of the robbers, that these were taken from the eyewitnesses as a group minutes after the crime was committed, that his notes were only sketchy at best, and that they had also been used in the filling out of police forms. He also testified that he was unable to locate the notes at the time of trial.

Appellants contend that the notes in question were "substantially verbatim recital[s] of [an] oral statement[s] made by [the witnesses]" and therefore the notes were "statements" within the meaning of the Act, 18 U.S.C. § 3500(e)(2). Appellants then argue that their receipt of the police reports incorporating the statements was not sufficient for purposes of the Act because the reports were incomplete and merely an amalgam of all the statements given, thus making it impossible to determine which witness gave what information.

■ We need not reach the latter issue since the record makes clear that the main purpose of the officers was to obtain sufficient information to begin an immediate investigation. The notes in question were taken hastily and appear to have only highlighted the most important facts which were needed for this purpose. The Supreme Court has held that, when the evidence introduced indicates that destroyed notes taken by investigating officials were informal or "rough," they cannot be considered "substantially verbatim" statements within the meaning of the Act. See United States v. Augenblick, 393 U.S. 348, 354–355, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969).[14]

## E. The Fairness of the Trial.

### 1. Speedy Trial Issue.

■ Both appellants complain that the delay of this case for a period of seventeen and one-half months between the time of arrest and the time of trial violated their Sixth Amendment right to a speedy trial. The court has been of the view that any delay which exceeds a period of one year between arrest and trial raises a speedy trial claim of *prima facie* merit. See, e. g., Harling v. United States, 130 U.S.App.D.C. 327, 401 F.2d 392, 395 (1968); Hedgepeth v. United States, 124 U.S.App.D.C. 291, 293, 364 F.2d 684, 686 (1966). In examining delays which exceed this period, "the length of the delay; reasons for the delay; diligence of the prosecutor, court and defense counsel; and reasonable possibility of the prejudice from delay" are indicia which have been utilized in order to determine the merit of this claim. Hedgepeth v. United States, 125 U.S.App.D.C. 19, 21, 365 F.2d 952, 954 (1966). See also Dickey v. Florida, 398 U.S. 30, 48, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring).

■ Appellant Hines argues that the Government needlessly delayed the suppression hearing for five months. As

---

14. We have recently emphasized the necessity for the systematic preservation by law enforcement officials of contemporaneous records useful in the search for truth, which is the overriding objective of a criminal trial. United States v. Bryant, 142 U.S.App.D.C. 132, 142, 439 F.2d 642, 652 (1971). The events in issue before us happened long before *Bryant* was decided, but they underscore the rationality of our insistence in that case that for the future the Government must be in a position to "show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable (footnote omitted) evidence gathered in the course of a criminal investigation."

support for this contention, he points out that all motions which were relevant to the hearing were filed by the middle of April, 1968, and that, while he was prepared for the suppression hearing at that time, the Government had sought and gained a continuance on April 26, 1968, and the hearing was delayed until September 20, 1968. However, our examination of the docket reveals that the relationship between the continuance and the five month delay is slight. The Government, with appellants' consent, was granted a three week delay on April 26. On May 17, 1968, when the continuance expired, a trial judge was assigned. There was difficulty in establishing a date certain for the proceeding due to the fact that appellant Ware had disappeared for a month while he was out on bond. When Ware was found, the earliest date on which the hearing could be set was the above-mentioned day in September.

▪ Appellant's second argument is that he was prejudiced by the delay due to the destruction of the police notes, thereby hampering his ability to cross-examine the eyewitnesses and the investigating police officers. Similarly, he argues that he was prejudiced by the Government witnesses' failing memories.

We have already held that the notes were not "statements" within the meaning of the Jencks Act. Therefore, appellant was not prejudiced by their destruction, since at no point was he entitled to examine them. Moreover, our study of the record reveals that the Government was equally, if not more extensively, prejudiced by the dulled memories of its own witnesses.

▪ Appellant Ware complains that he was prejudiced by the last-minute introduction of fingerprints into evidence. Throughout the proceedings prior to trial, the Government had assured Ware that there was no fingerprint evidence linking him to the crime. However, immediately before trial, the prosecution discovered that such evidence did in fact exist. Appellant Ware was not informed of this fact until the day of the trial.

We are at a loss to understand in what way appellant was constitutionally prejudiced by this last minute discovery. Of course, had the case been tried at an earlier date, and had the evidence not been discovered, appellant Ware's case would have been substantially aided. But the fact that the prosecutor's evidence was strengthened at a later date, due to the discovery of demonstrative evidence that would have always been present had it not been for police confusion, cannot be termed prejudicial in any Sixth Amendment sense. The discovery of the evidence is not necessarily related to the delay. The evidence was found because of the prosecutor's thoroughness in preparation for trial, and we could have expected the same fastidiousness on the part of the prosecutor had the trial been scheduled for an earlier date. Finally, we note that appellant Ware was afforded sufficient opportunity to prepare for the introduction of this evidence. In a bench colloquy during cross-examination of the police fingerprint expert, appellant Ware's counsel stated that he had had the necessary time to examine the fingerprints, that he was satisfied with his examination, and that he had received advice from his own expert concerning the fingerprints.

2. *Prejudicial Joinder of Defendants.*

Appellant Hines contends that the trial court erred in its denial of his motion for a separate trial. He offers two theories in support of this contention. First, he claims that being tried with his brother, Edward, and appellant Ware amounted to "guilt by association." He urges that he was unnecessarily implicated in the crime due to the strength of the case against appellant Ware, combined with the fact that appellant Ware was in the Hines' residence when he was arrested. Moreover, he argues that, given the weak case the Government presented against his brother, the only conceivable reason Edward Hines was brought to trial was to highlight appellant Hines' involvement in the crime.

Second, appellant Hines notes that in his closing argument to the jury, ap-

pellant Ware's counsel drew attention to the fact that appellant Ware had taken the stand in his own behalf, stating "as you and I, if we were innocent, we would take the stand to try to exonerate ourselves. . . . " Appellant Hines argues that such an assertion invited the jury to make an adverse inference about his own failure to take the stand.

■ Since both appellants were charged with the commission of the same crime, joinder of their cases was authorized by Rule 8(b) of the Federal Rules of Criminal Procedure. Although Rule 14 recognizes that severance may be required where joinder tends to prejudice one or both of the codefendants, the trial judge has been given wide latitude in this area. *See, e. g.*, United States v. Robinson, 139 U.S.App.D.C. 286, 432 F. 2d 1348, 1351 (1970). Moreover, in reviewing the exercise of that discretion "[t]he balance has been struck in favor of joint trials . . . " United States v. Krechevsky, 291 F.Supp. 290, 294 (D.C. 1967). As the Ninth Circuit in Parker v. United States, 404 F.2d 1193, 1196 (1968) has stated:

> [Joinder] expedites the administration of justice, reduces the congestion of the trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.

■ Viewed in this light, we find appellant Hines' "guilt by association" argument somewhat tenuous. In the first place, the jury was carefully instructed to avoid inferring guilt by association due to the joinder, and there is some indication that they heeded this admonition since they acquitted Edward Hines. Edward was the one defendant who had the most to fear from association, as the Government's case against

him was the weakest. Second, the taint appellant Hines suffered by being tried with the other two defendants was minimal. Surely the fact that he was closely associated with his brother could not have prejudiced him. Since the Government had such a weak case against the latter, it was just as possible that the jury would feel the case against both was weak. Moreover, while there was substantial evidence implicating appellant Ware in the robbery, there was an equal, if not greater, amount of evidence implicating Hines.

■ The statement made to the jury concerning appellant Ware's taking the stand raises a more serious question. Appellant Hines refers to De Luna v. United States, 308 F.2d 140 (5th Cir. 1962), as support for his proposition that such comment calls for reversal. However, we note that the *De Luna* case involved a more serious trespass on the accused's Fifth Amendment rights. In that case, both defendants presented conflicting and irreconcilable defenses, only one defendant testified, and in closing argument the latter's counsel urged the jury to draw an adverse inference from the co-defendant's silence. In the present case, the defenses were not mutually exclusive as they were in *De Luna*. This court has strongly suggested, and other circuits have held, that this distinction alone precludes the application of the *De Luna* rule. *See* Rhone v. United States, 125 U.S.App.D.C. 47, 365 F.2d 980, 981 (1966). *See also* Kolod v. United States, 371 F.2d 983, 991 (10th Cir. 1967); United States v. Kahn, 381 F.2d 824, 841 (7th Cir.), cert. denied, 389 U. S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967); United States v. Barney, 371 F. 2d 166, 171 (7th Cir. 1966).[15]

Appellant Ware's counsel, complying with the trial court's mandate when it denied appellant Hines' motion, did not directly ask the jury to draw any adverse inference from appellant Hines'

---

15. *See also* 8 Moore's Federal Practice ¶ 14.04 [3].
("The real prejudice in the *De Luna* case was not in the comment on failure to take the stand but in the situation to which the comment was directed.") (footnote omitted)

failure to testify. Instead, he merely asked the jury to draw a favorable inference from his client's willingness to testify. Of course, due to his strong phraseology, there is a possibility that the jury's attention was drawn to appellant Hines' silence. However, Hines' failure to take the stand was "no more than incidentally 'pointed up'"[16] and did not constitute "an exaggerated form of one of the inherently prejudicial factors in multi-defendant trials."[17] We believe that an adequate remedy in such a situation is an immediate cautionary instruction on the part of the judge. *See* United States v. Krechevsky, *supra,* at 292. The trial judge here did offer such an instruction and appellant Hines' counsel declined it. In view of these circumstances, we cannot find an abuse of the trial judge's discretion in refusing to sever appellant Hines' case.

The judgments of conviction in both No. 23,281 and No. 23,391 are

Affirmed.

BAZELON, Chief Judge (concurring in part and dissenting in part):

I think that a mistrial should have been declared for appellant Hines after prejudicial comments were made by the counsel for his co-defendant; and that the notes taken by police officers immediately after the robbery were "statements" within the meaning of the Jencks Act, 18 U.S.C. § 3500(e)(2). I therefore dissent from Parts D and E2 of the majority's opinion.

**I.**

Appellant Hines claims that he suffered prejudice as a result of being tried jointly with Ware in light of Ware's counsel's closing comment to the jury to the effect that an inference of innocence should be drawn from Ware's willingness to testify. Hines did not testify and informed the trial judge of this potential problem prior to trial in his motion for severance. The trial court denied this motion and instructed both counsel not to comment on Mr. Hines' failure to testify.[1]

While this ruling was entirely within the trial court's discretion, I cannot agree that the prohibition should have been understood to be confined to comments on an inference of guilt which could be drawn from Hines' silence. In my opinion, the comments made by Ware's counsel were not "innocuous"[2] and served to point out not that Hines had a right to remain silent but that the innocent would not exercise that right.

I agree that joinder may serve the interests of judicial administration and economy, but such factors should never excuse violations of a defendant's constitutional rights. The comment made by Ware's counsel trespassed on Hines' Fifth Amendment rights and I cannot in conscience accept the majority's conclusion that this case can be distinguished from De Luna v. United States, 308 F.2d 140 (5th Cir. 1962) because the trespass appears to be less "serious." Judge Wisdom's analysis in that case is not limited to comments which refer to the guilt of the silent rather than the innocence of the loquacious.[3] If a co-defendant in a criminal trial chooses to remain silent, *all* commentary which in-

16. United States v. Barney, supra.

17. 8 Moore's Federal Practice ¶ 14.04 [3].

1. Hines thus avoided the procedural dilemma posed in both Rhone v. United States, 125 U.S.App.D.C. 47, 365 F.2d 980 (1966) and Kolod v. United States, 371 F.2d 983 (10th Cir.), cert. denied, 389 U.S. 834, 88 S.Ct. 40, 19 L.Ed.2d 95 (1967).

2. *See* United States v. Barney, 371 F.2d 166 (7th Cir. 1966), cert. denied, 387 U.S. 945, 87 S.Ct. 2080, 18 L.Ed.2d 1333 (1967).

3. "Even if it were true that reasonable men cannot avoid drawing 'natural inferences from an accused's silence', that is quite a different thing from having the silence emphasized by comment. The imputation of guilt from silence, if it does nothing else, may confuse the jury as to the presumption of innocence in favor of the accused." De Luna v. United States, *supra,* 308 F.2d at 152.

vites an inference of guilt must be avoided.[4]

I also cannot share the majority's conviction that an immediate cautionary instruction on the part of the judge would remedy the error. Rather, the impact of such an instruction would be to remind the jury that Hines did not testify, which in the wake of the improper comment would again invite the inference that Hines had something to hide. See De Luna v. United States, *supra,* 308 F. 2d at 154–155. As soon as the improper comment was made, and counsel for Hines objected to it,[5] the trial judge should have declared a mistrial and granted Hines a separate trial.

Accordingly, Hines is now entitled to a new trial.

## II.

Accepting the majority's description of the notes taken by various police officers immediately after the robbery in question, I cannot agree with the majority's narrow construction of what constitutes "verbatim statements" within the meaning of the Jencks Act. It is not disputed that the witnesses gave brief descriptions of the three robbers which enabled the police to start searching for them, and I am willing to concede that these descriptions were, like the notes, rough, sketchy and general in nature.

However, appellants have steadfastly maintained throughout their trial and this appeal that the handwritten notes would contain, substantially verbatim, the precise words of description which were used by and could be ascribed to, individual witnesses—information which does not appear in the formal police reports. Police testimony about the taking of these handwritten notes does not refute this claim. In fact, it would seem only reasonable that specific words of description would be written down in the course of even the roughest notetaking.

Because a few words rather than complete sentences or statements are involved, there is no reason to doubt the good faith of appellants' claim. Identification testimony constituted much of the Government's case, and impeachment of the eyewitnesses with their own initial descriptions might be crucial. In this case, there appears to be some confusion about which of the robbers entered the realty office and which remained outside as lookout, as well as some conflict in the descriptions of the wearing apparel of each.

In cases of this kind I would treat rough notes which are likely to contain the descriptions first offered by eyewitnesses as "substantially verbatim statements" within the meaning of the Jencks Act. United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) is not to the contrary since that case involved rough and abridged notes of a lengthy interview in which whole sentences and statements were at issue.

---

4. United States v. Kahn, 381 F.2d 824 (7th Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967), supports this conclusion. In that case, the Seventh Circuit upheld the District Court's denial of severance to several co-defendants who claimed they were prejudiced by their *inability* to comment upon the failure of a single co-defendant to take the stand. The grounds of decision in Rhone v. United States, *supra,* 125 U.S.App.D.C. 47, 365 F.2d 980 involve entirely different issues. Contrary to the majority's reading of that case I do not find in it the strong suggestion that *De Luna* is applicable *only* when co-defendants present mutually exclusive defenses.

5. After both counsel had made their closing statements, but before the trial judge instructed the jury, counsel for Hines made his objection. While he did not formally move for a mistrial, he stated "if I did, I don't think you'd grant one, but I do think it was a prejudicial comment." The trial judge was therefore aware of the prejudicial error.

Even if these notes are within the Jencks Act, the Government asserts, no sanctions should be applied for the Government's failure to produce them since they were either lost or destroyed. Under this court's recent decision in United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), in the future the police department will be *required* to make "earnest efforts" to preserve materials such as these notes and negligent loss will not be excused. In this case, as in *Bryant,* an inquiry into the possible bad faith of the police officers who took the notes is warranted. It appears on the record only that some notes were "lost" or "destroyed" while some appear to have been kept. These are insufficient explanations under the standards announced in *Bryant.*

I would therefore remand both cases to the District Court for inquiry into the applicable regulations of the police department concerning the preservation of notes; and into whether the police officers acted negligently or in bad faith; and to determine whether Jencks Act sanctions should be applied.

### III.

I am very troubled by the question of whether there was probable cause to arrest the appellant Ware; and whether it was more than "merely the minimum of probable cause", as required by our *en banc* decision in Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385, 392 (1970) to permit entry into Mrs. Hines' home without a warrant to arrest Mr. Ware. A crucial factor in finding probable cause was the description given to the police of one of the robbers as wearing a dark raincoat. There is, however, some confusion in the record about this description. The handwritten police notes, which I consider subject to the Jencks Act, could clarify this confusion. Without these notes I refrain from any discussion of probable cause.